PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ANTHONY GERALD WHITE, SR.,
*Defendant-Appellant.*

No. 04-4349

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(CR-03-375-WDQ)

Argued: February 3, 2005

Decided: April 26, 2005

Before WILKINS, Chief Judge, DUNCAN, Circuit Judge, and
James C. CACHERIS, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion. Chief Judge Wilkins wrote the opinion, in which Judge Cacheris joined. Judge Duncan wrote an opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** David Richard Solomon, GLASER & SOLOMON, L.L.C., Baltimore, Maryland, for Appellant. Christopher John Romano, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

**ON BRIEF:** Thomas M. DiBiagio, United States Attorney, Balti-more, Maryland, for Appellee.

---

## OPINION

WILKINS, Chief Judge:

Anthony Gerald White, Sr., appeals his convictions and sentence for drug and firearm offenses. We find no reversible error in the evi-dentiary rulings challenged by White and therefore affirm his convic-tions. Further, although we find that the district court plainly erred under *United States v. Booker*, 125 S. Ct. 738 (2005),[1] by treating the sentencing guidelines as mandatory in determining White's sentence, we conclude that White has not carried his burden of demonstrating that this error affected his substantial rights. Thus, we affirm White's sentence.

I.

This case arises from an investigation by the United States Drug Enforcement Administration (DEA) into drug trafficking activities at public housing complexes in Annapolis, Maryland. In early 2003, DEA agents used a confidential informant to make two controlled purchases of cocaine base from Gerald Hyman. Because these pur-chases involved communications with Hyman on his cellular tele-phone, agents obtained authority to conduct wiretaps on that telephone. Agents subsequently recorded calls between Hyman and White indicating that they were engaged in drug trafficking. After conducting additional surveillance of White and Hyman, agents obtained a search warrant for White's residence. Upon executing that warrant, officers seized two loaded firearms from a closet in the mas-ter bedroom, as well as five boxes of ammunition from a dresser in that bedroom.

White was charged with one count of conspiring to distribute 50 grams or more of cocaine base within 1,000 feet of a public housing

---

[1]Consolidated with *United States v. Fanfan*, 125 S. Ct. 738 (2005).

facility, *see* 21 U.S.C.A. §§ 846, 860(a) (West 1999), and two counts of possessing a firearm or ammunition as a convicted felon, *see* 18 U.S.C.A. § 922(g)(1) (West 2000). Following a trial, a jury convicted White on all three counts. At sentencing, the district court grouped the three counts together pursuant to *United States Sentencing Guidelines Manual* § 3D1.2(c) (2003). The district court determined that White was subject to a base offense level of 34 because the charged drug conspiracy involved locations within 1,000 feet of a public housing facility and 50 to 150 grams of cocaine base. *See* U.S.S.G. § 2D1.2(a)(1) (providing for a base offense level of "**2** plus the offense level from §2D1.1 applicable to the quantity of controlled substances directly involving a protected location"); *id.* § 2D1.1(c)(4) (providing for a base offense level of 32 for this drug quantity range). The district court imposed a two-level enhancement for White's possession of a firearm in connection with the drug conspiracy, *see id.* § 2D1.1(b)(1). White does not dispute that the facts found by the jury supported an offense level of 36 and a sentencing range of 188 to 235 months' imprisonment.[2] The district court further enhanced this offense level by two levels for obstruction of justice based on its finding that White committed perjury during his testimony at trial, *see id.* § 3C1.1. Based on White's total offense level of 38 and his criminal history category of I, the applicable guideline range was 235 to 293 months' imprisonment. The district court imposed a sentence at the bottom of this range, sentencing White to 235 months for the conspiracy offense and to concurrent 120-month terms for the firearm and ammunition offenses.

II.

White first contends that the district court committed two errors in admitting evidence at trial over his objection. We review rulings concerning the admission of evidence for abuse of discretion. *See United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004).

---

[2]We reject White's claim that the base offense level applied by the district court is unsupported by the record. The Government presented ample evidence to support the factual findings by the district court regarding White's base offense level, and the jury found those same facts in reaching its verdict.

### A.

White claims that the district court improperly admitted rebuttal testimony from Cassandra White (Cassandra), one of White's alleged coconspirators. White claims that the admission of this testimony violated Rules 404(b) and 608(b) of the Federal Rules of Evidence. We disagree.

On direct examination, White denied any involvement in drug trafficking during the period of the charged conspiracy, January through July 2003, instead claiming that his recorded telephone conversations with Hyman concerned a different illegal activity—the sale of fraudulent automobile insurance documents. White admitted, however, that he sold cocaine for a brief period in 1989. On cross-examination, White clarified that he sold small quantities of powder cocaine approximately once a week during a six-month period in 1989. White further testified that although he had seen Cassandra before, he did not know her personally, nor had he ever sold drugs to her. Over White's objection, the district court then permitted the Government to call Cassandra as a rebuttal witness. Although the Government offered various bases for the admission of Cassandra's testimony, the district court ultimately concluded that the testimony was admissible under Rule 404(b). Cassandra testified that for approximately one year during the early 1990s, she regularly purchased cocaine base from White, "[s]ometimes once a day, twice a day, sometimes three times a day." J.A. 683.

Rule 404(b) provides that evidence of prior bad acts may be admissible for purposes other than "to prove the character of a person in order to show action in conformity therewith." Such purposes include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Evidence of prior bad acts is admissible under Rule 404(b) if the evidence is (1) relevant to an issue other than the general character of the defendant, (2) "probative of an essential claim or an element of the offense," and (3) reliable. *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997). Additionally, the probative value of the evidence must not be substantially outweighed by the danger that it will cause unfair prejudice. *See* Fed. R. Evid. 403; *Queen*, 132 F.3d at 997.

Here, White does not challenge the reliability of Cassandra's testimony. Rather, he apparently contends that the testimony was irrelevant, unnecessary, and unfairly prejudicial. In particular, White argues that this evidence concerned events factually distinct and temporally remote from the charged conspiracy. We conclude, however, that the evidence of White's prior drug sales to Cassandra was relevant and necessary. Contrary to White's testimony that he had only dabbled in the drug trade for a brief period, Cassandra's testimony tended to show that White had been a regular dealer of narcotics and therefore that he possessed the requisite knowledge and intent to commit the charged offense. *See United States v. Sanchez*, 118 F.3d 192, 196 (4th Cir. 1997) (holding that a not-guilty plea places defendant's intent at issue and that evidence of similar prior crimes can thus be relevant to prove intent to commit charged crime); *United States v. Mark*, 943 F.2d 444, 448 (4th Cir. 1991) (explaining that "a defendant's knowledge and intent are clearly elements which the prosecution must establish to prove a [narcotics] conspiracy"). Further, as the district court noted, although Cassandra's testimony concerned events that were remote in time from the charged offense, the evidence was nonetheless probative because it involved prior drug transactions between White and Cassandra—both of whom were named as coconspirators in the present indictment. *See Sanchez*, 118 F.3d at 195 (explaining that evidence of earlier narcotics transactions between alleged coconspirators "show[ed] the relationships between the parties").

Moreover, the probative value of this evidence was not substantially outweighed by the danger that it would cause unfair prejudice. In light of the Government's other compelling evidence that White was involved in the charged conspiracy and White's admission of some prior drug dealing, we cannot say that the evidence concerning his prior dealings with Cassandra unfairly prejudiced the jury against him. And, any risk of such prejudice was mitigated by a limiting instruction from the district court clarifying the issues for which the jury could properly consider this evidence. *See Hodge*, 354 F.3d at 312. We therefore conclude that the district court did not abuse its discretion in admitting Cassandra's testimony under Rule 404(b).[3]

---

[3]White also suggests that the Government failed to give proper notice of its intent to offer Rule 404(b) evidence at trial. *See* Fed. R. Evid.

White also contends, however, that the admission of Cassandra's testimony violated Rule 608(b), which provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . may not be proved by extrinsic evidence." White relies on *United States v. Ling*, 581 F.2d 1118 (4th Cir. 1978), in which we reversed a defendant's

---

404(b) (providing that "upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence [of prior bad acts] it intends to introduce at trial"); *Hodge*, 354 F.3d at 312. It appears that White first learned that the Government planned to offer evidence of his prior drug dealing during a colloquy with the court in the middle of trial. However, White likely has not preserved the issue of late notice. Upon first learning that the Government might offer the evidence, White complained about the lack of prior notice. The district court then directed the parties to confer about the details of this evidence and indicated that it would address the issue later in the proceedings. When the district court revisited this issue, White objected to the admission of Cassandra's testimony on various grounds but did not mention the issue of notice. *See Bituminous Constr., Inc. v. Rucker Enters.*, 816 F.2d 965, 969 (4th Cir. 1987) (refusing, when party objected on specific ground to admission of evidence when it was introduced at trial, to consider argument that evidence should have been excluded on another ground); *cf. United States v. Ellis*, 121 F.3d 908, 918 (4th Cir. 1997) (holding that when district court deferred ruling on defendant's motion in limine regarding certain evidence and defendant subsequently failed to object when that evidence was introduced during trial, review was limited to plain error). Nor has White meaningfully developed this issue in his appellate brief: his argument on this point essentially consists of one sentence.

Even if we were to review this issue for plain error, *see* Fed. R. Crim. P. 52(b), we would conclude that any plain error in admitting Cassandra's testimony absent sufficient notice did not affect White's substantial rights because, in light of the Government's other compelling evidence that White was engaged in the charged drug conspiracy, the admission of evidence of White's prior drug dealing did not affect the outcome of the trial. *See United States v. Olano*, 507 U.S. 725, 732, 734 (1993). For the same reason, we conclude that even if White had preserved the issue of insufficient notice, the admission of Cassandra's testimony was harmless. *See* Fed. R. Evid. 103(a); *United States v. Savage*, 390 F.3d 823, 830 (4th Cir. 2004).

narcotics convictions because the district court had improperly permitted the Government to introduce testimony from a police officer rebutting the defendant's testimony on cross-examination that he had never discharged a firearm on a public street. *See Ling*, 581 F.2d at 1121-23. In *Ling*, however, "[t]here was no link between the rebuttal testimony . . . and an element of the crime charged"; rather, "the only purpose of [that testimony was] to impeach the defendant's credibility and prejudice the jury against him." *Id.* at 1122. Here, as explained above, Cassandra's rebuttal testimony was probative of whether White possessed the necessary intent for the charged conspiracy offense. And, we have held that even when rebuttal testimony regarding a defendant's prior bad acts impeaches the defendant's earlier testimony denying such acts, "Rule 608(b) should not be read so broadly as to disallow the presentation of extrinsic evidence that is probative of a material issue in a case." *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 531 (4th Cir. 1985). We therefore conclude that the admission of Cassandra's testimony did not violate Rule 608(b).

### B.

White also claims that the district court erred in admitting evidence that a defaced law enforcement badge and a sweatshirt bearing the words "Fugitive Agent" were found in the same dresser drawer as two of the boxes of ammunition seized from White's residence. White asserts that the admission of this evidence violated Federal Rule of Evidence 403 because the jury may have inferred that White used the items to impersonate a law enforcement officer. *See* Fed. R. Evid. 403 (providing that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

Although White admitted that the badge and sweatshirt belonged to him, he denied that those items were found in the dresser containing the ammunition. White and his wife also testified that the ammunition and the dresser in which it was kept belonged solely to her. Thus, the evidence that officers found the badge and sweatshirt in the dresser containing the ammunition was relevant to show that White constructively possessed the ammunition. To obtain a conviction on a theory of constructive possession, the Government must show

through direct or circumstantial evidence "that the defendant exercised, or had the power to exercise, dominion and control over the item." *United States v. Jackson*, 124 F.3d 607, 610 (4th Cir. 1997) (internal quotation marks omitted). Here, proof that the ammunition was found in White's residence likely would have been sufficient to show that White constructively possessed it. *See United States v. Shorter*, 328 F.3d 167, 172 (4th Cir.), *cert. denied*, 540 U.S. 928 (2003). Nevertheless, because White and his wife claimed to have kept separate dressers, the district court did not abuse its discretion in admitting the evidence of the badge and sweatshirt to demonstrate that White exercised control over the dresser in which the ammunition was found. *See United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996) (en banc) (explaining that constructive possession "may be sole or joint" (internal quotation marks omitted)).

In addition, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. The Government did not attempt to use this evidence for any purpose other than demonstrating constructive possession. We thus conclude that the district court did not abuse its discretion in refusing to exclude this evidence under Rule 403.

III.

White next argues that under *United States v. Booker*, 125 S. Ct. 738 (2005), the district court erred by treating the sentencing guidelines as mandatory in determining his sentence. White thus contends that he is entitled to "seek resentencing pursuant to the remedial scheme enunciated in *Booker*." Supp. Br. of Appellant at 8; *see Booker*, 125 S. Ct. at 769. Because White did not raise this issue in the district court, our review is for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-32 (1993). To establish plain error, White must show that an error occurred, that the error was plain, and that the error affected his substantial rights. *See Olano*, 507 U.S. at 732. Even if White makes this three-part showing, correction of the error remains within our discretion, which we "should not exercise . . . unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)) (second alteration in original).

As we recently explained in *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005), *Booker* held that the Sixth Amendment is violated when a district court, acting pursuant to the Sentencing Reform Act and the guidelines, imposes a sentence greater than the maximum authorized solely by the facts found by the jury. *See Booker*, 125 S. Ct. at 756. To remedy this Sixth Amendment problem, the Supreme Court severed and excised the statutory provisions that mandated sentencing and appellate review in conformance with the guidelines, *see id.* at 764, thereby rendering the guidelines "effectively advisory," *id.* at 757. After *Booker*, the discretion of a sentencing court is no longer mandatorily bound by the range prescribed by the guidelines, though a sentencing court is still required to "consult [the] Guidelines and take them into account when sentencing," *id.* at 767. In determining a defendant's sentence, a sentencing court must first calculate the applicable guideline range. *See Hughes*, 401 F.3d at 546. Then, the court must consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in 18 U.S.C.A. § 3553(a) (West 2000 & Supp. 2004) before imposing the sentence. *See Booker*, 125 S. Ct. at 764-65;[4] *Hughes*, 401 F.3d at 546. If the court imposes a sentence outside the guideline range, it should explain its reasons for doing so. *See Hughes*, 401 F.3d at 546 & n.5 (citing 18 U.S.C.A. § 3553(c)(2) (West Supp. 2004), requiring sentencing courts to set forth "the specific reason for the imposition of a sentence different from that described" in the guidelines). If the sentence is appealed, we will affirm it as long as it is within the statutorily prescribed range, *see Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and is reasonable, *see Booker*, 125 S. Ct. at 765-66. *See*

---

[4]*Booker* explained that the remaining provisions of the Sentencing Reform Act, which were left intact by the Court's holding, still require sentencing courts "to consider the Guidelines sentencing range established for the applicable category of offense committed by the applicable category of defendant, the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Id.* at 764-65 (citing 18 U.S.C.A. § 3553(a)(1), (3)-(7)) (internal quotation marks, citation & alteration omitted). Sentencing courts must also continue "to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care." *Id.* at 765 (citing 18 U.S.C.A. § 3553(a)(2)).

*Hughes*, 401 F.3d at 546-47. With this background in mind, we turn to the plain-error inquiry.

### A.

"In reviewing for plain error, our initial inquiry is whether an error occurred." *United States v. Hastings*, 134 F.3d 235, 239 (4th Cir. 1998). In determining whether an error occurred here, it is important to understand the specific error asserted by White. At oral argument, White clarified that he is *not* asserting that the sentence imposed by the district court violated his Sixth Amendment rights. Rather, White's sole claim under *Booker* is that the district court erred in sentencing him under a mandatory, rather than an advisory, guidelines regime.[5]

In *Booker*, the Supreme Court emphasized that "[lower courts] must apply today's holdings—both the Sixth Amendment holding and [the] remedial interpretation of the Sentencing Act—to all cases on direct review." *Booker*, 125 S. Ct. at 769. We specifically recognized this point in *Hughes*: "The *Booker* Court concluded that [its] remedial scheme should apply not only to those defendants, like Booker, whose sentences had been imposed in violation of the Sixth Amendment, but also to those defendants, like Fanfan, who had been sentenced under the mandatory regime without suffering a constitutional violation." *Hughes*, 401 F.3d at 547; *see id.* at 553. Thus, even in the absence of a Sixth Amendment violation, the imposition of a sentence under the former mandatory guidelines regime rather than under the advisory regime outlined in *Booker* is error.[6] *See id.* at 553; *see also Olano*,

---

[5]In *Hughes*, we did not consider whether the district court erred in failing to treat the guidelines as advisory in sentencing Hughes because Hughes had not raised that issue on appeal. *See Hughes*, 401 F.3d at 552. Rather, Hughes argued only that the district court violated his Sixth Amendment rights by imposing a sentence that exceeded the maximum permitted by the jury's verdict alone. *See id.* at 545, 552. Here, however, White has raised only the issue of whether the district court erred in treating the guidelines as mandatory in determining his sentence. And, we decline to raise the Sixth Amendment issue sua sponte.

[6]Noting that *Booker* "created a broader category of defendants eligible for resentencing than those for whom judicial fact finding increased their

507 U.S. at 732-33 (describing "error" as a "[d]eviation from a legal rule"). The district court therefore erred in treating the guidelines as mandatory in sentencing White.[7]

## B.

"Next, the error must be plain." *Hastings*, 134 F.3d at 239. For purposes of plain-error review, "'[p]lain' is synonymous with 'clear' or, equivalently, 'obvious.'" *Olano*, 507 U.S. at 734. An error is plain at least when "the law at the time of trial was settled and clearly contrary to the law at the time of appeal." *Johnson v. United States*, 520 U.S. 461, 468 (1997); *see United States v. David*, 83 F.3d 638, 645 (4th Cir. 1996) (holding that an error is plain when "an objection at trial would have been indefensible because of existing law, but a supervening decision prior to appeal reverses that well-settled law"). After *Booker*, sentencing courts must treat the guidelines as advisory and consider them along with various other factors in determining a defendant's sentence. *See Booker*, 125 S. Ct. at 764-65. And, based on the directive in *Booker* that the advisory guidelines regime must be applied to all cases on direct review, we conclude that the error of sentencing White under a mandatory guidelines regime is plain.

---

sentence," *post*, at 25, the dissent maintains that all defendants seeking resentencing under *Booker* must be treated the same under plain-error review and therefore that *Hughes* requires us to remand White's case. But the dissent overlooks that this "broader category" includes different types of defendants who may assert different claims under *Booker*. *See supra* note 5 (distinguishing Sixth Amendment claim raised by defendant in *Hughes* from error of sentencing under mandatory regime alleged by White). Indeed, *Hughes* rejected the notion that all *Booker* claims are equivalent, emphasizing that sentencing under a mandatory regime is "a separate class of error . . . distinct from the Sixth Amendment claim that gave rise to the decision in *Booker*, and it is non-constitutional in nature." *Hughes*, 401 F.3d at 553. "This error," *Hughes* explained, "may be asserted even by defendants whose sentences do not violate the Sixth Amendment." *Id.* We therefore must conduct an independent plain-error analysis of White's claim that he was erroneously sentenced under a mandatory regime.

[7]We of course offer no criticism of the district judge, who followed the law and procedure in effect at the time of White's sentencing.

## C.

Third, White must show that the error of sentencing him under a mandatory guidelines regime "affect[ed] [his] substantial rights." *Olano*, 507 U.S. at 732 (internal quotation marks omitted). "[I]n most cases [this] means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Id.* at 734; *accord Hastings*, 134 F.3d at 240. Thus, "[n]ormally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)." *Olano*, 507 U.S. at 735. However, the *Olano* Court noted, without deciding, that there may be "errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice" and that "[t]here may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome." *Id.* We consider each of these three possibilities below. *See id.* at 737; *United States v. Tipton*, 90 F.3d 861, 874 (4th Cir. 1996).

### 1.

We first consider whether sentencing White under a mandatory guidelines regime falls within the special category of forfeited errors suggested in *Olano* "that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." *Olano*, 507 U.S. at 735. Although we have never held that any particular unpreserved error must be presumed prejudicial, we have acknowledged that such errors might exist. *See United States v. Rolle*, 204 F.3d 133, 139 (4th Cir. 2000) (assuming *arguendo* that such a category of errors exists but concluding that the error in question did not fall within that category); *Tipton*, 90 F.3d at 875 (same); *United States v. Floresca*, 38 F.3d 706, 713 n.16 (4th Cir. 1994) (en banc) (same); *United States v. Moore*, 11 F.3d 475, 481-82 (4th Cir. 1993) (same). While we need not decide today the precise circumstances, if any, under which an error should be presumed prejudicial, we believe that any such determination will depend on consideration of two factors: (1) the general risk that defendants subjected to the particular type of error will be prejudiced and (2) the difficulty of proving specific prejudice from that type of error. *Cf. Olano*, 507 U.S. at 741 (declining to presume prejudice because mere occurrence of error did not create sufficient risk of prejudice).

We recognize that our sister circuits —while sharing our concern for the ability of a particular defendant to establish prejudice—have looked primarily to the gravity of the error, limiting their risk inquiries simply to whether an opportunity for a prejudicial effect existed under the circumstances. *See, e.g.*, *United States v. Reyna*, 358 F.3d 344, 351-52 (5th Cir.) (en banc) (presuming prejudice from a denial of allocution "given the nature of the right and the difficulty of proving that a violation affected a specific sentence"), *cert. denied*, 124 S. Ct. 2390 (2004); *United States v. Prouty*, 303 F.3d 1249, 1253 (11th Cir. 2002) (presuming prejudice from a denial of allocution "[b]ecause allocution plays a central role in the sentencing process" and "a defendant cannot easily demonstrate prejudice" caused by its denial); *United States v. Adams*, 252 F.3d 276, 287-88 (3d Cir. 2001) (presuming prejudice in light of difficulty of proving actual prejudice and because allocution, while not constitutional, is "ancient in origin" and "is the type of important safeguard that helps assure the fairness, and hence legitimacy, of the sentencing process"). We disagree with this emphasis.

Contrary to our sister circuits, we believe it is incorrect to make the gravity of the violated right a principal focus in determining whether prejudice should be presumed. Indeed, courts routinely refuse to reverse convictions and sentences on the basis that a serious error nevertheless did not affect the defendant's substantial rights. *See, e.g.*, *United States v. Ellis*, 326 F.3d 593, 599-600 (4th Cir.) (holding that sentence exceeding statutory maximum by at least 20 years did not affect defendant's substantial rights because defendant received equal or longer concurrent sentences on other counts), *cert. denied*, 540 U.S. 907 (2003); *Moore*, 11 F.3d at 481-82 (holding that statements by prosecutor during closing argument that defendant and coconspirator were "liars," though "highly improper," did not affect defendant's substantial rights because record showed that statements did not affect outcome of trial; expressly refusing to presume prejudice). As the Supreme Court indicated in *Olano*, a proper focus of the presumed prejudice inquiry is not on the gravity of the right at stake, but rather on the risk that the defendant has been prejudiced but will be unable to demonstrate the existence of that prejudice. *See Olano*, 507 U.S. at 741.

In the case at hand, we conclude that the general risk of harm does not in itself suffice to warrant a presumption of prejudice. *Cf. id.*

(holding that risk of prejudice from improper presence of alternate jurors during jury deliberations was insufficient "to justify a presumption of prejudice"). In any given case after *Booker*, a district court will calculate, consult, and take into account *the exact same guideline range* that it would have applied under the pre-*Booker* mandatory guidelines regime. *See Booker*, 125 S. Ct. at 767; *Hughes*, 401 F.3d 546. This guideline range remains the starting point for the sentencing decision. *See Hughes*, 401 F.3d at 546. And, if the district court decides to impose a sentence outside that range, it should explain its reasons for doing so. *See id.* Thus, while we believe that the appropriate circumstances for imposing a sentence outside the guideline range will depend on the facts of individual cases, we have no reason to doubt that most sentences will continue to fall within the applicable guideline range.

Our holding with respect to this factor is consistent with the substantial rights analysis undertaken by the Supreme Court in *Jones v. United States*, 527 U.S. 373, 394-95 (1999). In *Jones*, the Court reviewed for plain error a capital defendant's claim that certain jury instructions misled the jury into believing that if it did not decide unanimously whether to recommend a life sentence or the death penalty, the judge would impose a sentence less severe than life imprisonment. *See Jones*, 527 U.S. at 384-95. The Court held that the instructions were not erroneous, *see id.* at 389-94, but further explained that the defendant could not satisfy the substantial rights prong in part because there was no nonspeculative basis for concluding that the alleged error was prejudicial:

> [E]ven assuming that the jurors were confused over the consequences of deadlock, petitioner cannot show the confusion necessarily worked to his detriment. It is just as likely that the jurors, loath to recommend a lesser sentence, would have compromised on a sentence of life imprisonment as on a death sentence. *Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights.* Cf. [*Romano v. Oklahoma*, 512 U.S. 1, 14 (1994).] In *Romano*, we considered a similar argument, namely, that jurors had disregarded a trial judge's instructions and given undue weight to certain evidence. In rejecting that argument, we

noted that, even assuming that the jury disregarded the trial judge's instructions, "[i]t seems equally plausible that the evidence could have made the jurors more inclined to impose a death sentence, or it could have made them less inclined to do so." *Ibid.* Any speculation on the effect of a lesser sentence recommendation, like the evidence in *Romano*, would have had such an indeterminate effect on the outcome of the proceeding that we cannot conclude that any alleged error in the District Court's instructions affected petitioner's substantial rights.

*Id.* at 394-95 (emphasis added).

Furthermore, as to the second factor, the difficulty of proving specific prejudice, *Jones* also provides important guidance. This is so because demonstrating prejudice from an erroneous jury instruction—the error at issue in *Jones*—is, if anything, more difficult than proving prejudice from the imposition of a sentence under a mandatory guidelines regime—the error at issue here. While jury deliberations are generally secret, a district court often explains on the record its reasons for selecting the sentence imposed. *See infra* Part III.D. Indeed, courts are required to give their reasons whenever the sentencing range exceeds 24 months. *See* 18 U.S.C.A. § 3553(c)(1) (West Supp. 2004). That the Supreme Court in *Jones* analyzed for actual prejudice the allegedly erroneous jury instructions at issue there—even though the defendant had virtually no chance of demonstrating prejudice—strongly indicates that the difficulty of proving actual prejudice from the imposition of sentence under the mandatory regime is not alone a sufficient basis for presuming prejudice. *See also Olano*, 507 U.S. at 740-41 (declining to presume prejudice from improper presence of alternate jurors during jury deliberations); *infra* Part III.D.

Thus, we conclude that with respect to the error at issue here, neither the general risk that defendants subjected to it will be prejudiced, nor the difficulty of proving specific prejudice, warrant a presumption of prejudice. Our rejection of a presumption of prejudice here is also consistent with our previous decision in *United States v. Bros. Construction Co. of Ohio*, 219 F.3d 300 (4th Cir. 2000). There, Tri-State Asphalt Corporation (Tri-State) was convicted of fraud charges relating to its involvement in a federally funded highway project and was

sentenced to pay a fine of $500,000. *See Bros. Constr.*, 219 F.3d at 308. On appeal, Tri-State argued for the first time (and the Government conceded) that the district court improperly calculated the amount of loss attributable to Tri-State's conduct and therefore sentenced Tri-State based on an incorrect fine range. *See id.* at 319. The fine range applied by the district court was $334,503.36 to $669,006.72, while the proper range (according to Tri-State) was $305,077.68 to $610,155.36. *See id.* at 319.

Reviewing this claim for plain error, we rejected Tri-State's argument that our decision in *United States v. Ford*, 88 F.3d 1350 (4th Cir. 1996), established that the imposition of a sentence under an improper guideline range necessarily affects a defendant's substantial rights. *See id.* at 320.[8] Further, we determined that Tri-State's substantial rights were not affected because "[t]he district court imposed a fine . . . that was almost exactly in the middle of the fine range used by the district court," and that fine "would be only slightly above the middle of the fine range as calculated by Tri-State." *Id.* at 320. We therefore explained that "[t]here is nothing before us to indicate that the outcome would be different, even if we accepted Tri-State's position on this issue." *Id.*

In *Bros. Construction*, there was unquestionably some risk that the defendant received a higher fine as a result of the incorrect calculation of the guideline range. Nevertheless, we did not presume prejudice

---

[8]In *Ford*, we held that the defendant's substantial rights were affected by a plain error that resulted in a higher guideline range. *See Ford*, 88 F.3d at 1356. In *Bros. Construction*, however, we explained that the substantial-rights holding of *Ford* was based on the particular facts of that case—namely, that the district court, which had applied an incorrect guideline range based on an erroneous increase in the defendant's criminal history score and had sentenced the defendant at the bottom of that higher range, "expressly noted that the sentence would have been at the bottom of the sentencing range even if the defendant's criminal history had only been [in the lower category]." *Bros. Constr.*, 219 F.3d at 320; *see Ford*, 88 F.3d at 1355-56. Based on the difference between the low ends of the two guideline ranges at issue in *Ford*, "the defendant would [have] serve[d] a prison term three years longer than required under the sentencing guidelines." *Bros. Constr.*, 219 F.3d at 320; *see Ford*, 88 F.3d at 1356 & n.5.

but instead required the defendant to demonstrate actual prejudice from the error. For the reasons already stated, the error of sentencing a defendant under a mandatory guidelines regime presents an even lower risk of prejudice than the error in *Bros. Construction*. We thus conclude that a presumption of prejudice is inappropriate here. *See United States v. Gonzalez-Huerta*, No. 04-2045, 2005 WL 807008, at *5-*6 (10th Cir. Apr. 8, 2005) (en banc) (declining to presume prejudice from error of sentencing under mandatory guidelines regime); *United States v. Shelton*, 400 F.3d 1325, 1332 n.8 (11th Cir. 2005) (same); *United States v. Antonakopoulos*, 399 F.3d 68, 80 (1st Cir. 2005) (holding that defendant asserting error of sentencing under mandatory regime cannot satisfy substantial rights prong of plain error review merely by demonstrating that had he been sentenced under the advisory regime, he "might have" received a less severe sentence). *But see United States v. Barnett*, 398 F.3d 516, 527-29 (6th Cir. 2005) (adopting rebuttable presumption of prejudice from sentence imposed under the mandatory regime).

2.

We next consider whether the error of sentencing a defendant under a mandatory guidelines regime falls within the other special category of unpreserved errors noted in *Olano*—errors that may be noticed "regardless of their effect on the outcome," *Olano*, 507 U.S. at 735. We have recognized that this language refers to structural errors. *See David*, 83 F.3d at 647; *cf. Neder v. United States*, 527 U.S. 1, 7 (1999) (stating that structural errors "require automatic reversal (*i.e.*, 'affect substantial rights') without regard to their effect on the outcome"). Although "the vast majority of trial errors" are reviewed for their prejudicial effect on the defendant, "structural errors are conclusively presumed to affect the substantial rights of the defendant because they 'deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair.'" *United States v. Higgs*, 353 F.3d 281, 304 (4th Cir. 2003) (internal quotation marks omitted) (alteration in original) (quoting *Neder*, 527 U.S. at 8-9), *cert. denied*, 125 S. Ct. 627 (2004). The Supreme Court has held particular errors to be structural "only in a very limited class of cases" in which there is "a defect affecting the framework within which the trial proceed[ed], rather

than simply an error in the trial process itself." *Neder*, 527 U.S. at 8 (internal quotation marks omitted). Such defects include the complete deprivation of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *See id.* (collecting cases). We have cautioned that "judges should be wary of prescribing new errors requiring automatic reversal" and that "before a court adds a new error to the list of structural errors (and thereby requires the reversal of *every* criminal conviction in which the error occurs), the court must be certain that the error's presence would render *every* such trial unfair." *Sherman v. Smith*, 89 F.3d 1134, 1138 (4th Cir. 1996) (en banc); *see Higgs*, 353 F.3d at 305 (noting "the [Supreme] Court's reluctance to identify new structural errors").

We decline to classify the error of sentencing a defendant under the pre-*Booker* mandatory guidelines regime as a structural error. Unlike the errors that the Supreme Court has identified as structural, the treatment of the guidelines as mandatory rather than advisory does not deprive defendants of a "basic protection[ ]" without which the criminal process is inherently unfair, *Neder*, 527 U.S. at 8 (internal quotation marks omitted); *see id.* at 7 (characterizing structural errors as "intrinsically harmful"). A defendant has no inherent right to be sentenced under an advisory guidelines regime. *See Booker*, 125 S. Ct. at 758-59, 767-68 (concluding that Congress would have *preferred* to eliminate mandatory nature of guidelines and preserve judicial fact-finding rather than keeping mandatory regime and requiring jury fact-finding); *id.* at 771 (Stevens, J., dissenting in part) (emphasizing that "[n]either of the two Court opinions that decide these cases finds any constitutional infirmity inherent in [the Sentencing Reform Act or the guidelines]," and that the statutory provisions making the guidelines mandatory are not "even arguably unconstitutional"). Rather, the former mandatory regime had constitutional implications only to the extent that it required judges to impose sentences greater than authorized by the jury's verdict. *See id.* at 777 (Stevens, J., dissenting in part) (explaining that although the statutory provisions making the guidelines mandatory "can in certain cases, when combined with other statutory and Guidelines provisions, result in a violation of the Sixth Amendment, they are plainly constitutional on their faces"); *Hughes*, 401 F.3d at 553 n.11 (noting that "a mandatory guidelines regime poses a constitutional problem only insofar as the guideline

range involves extra-verdict enhancements"). Further, while *Booker* emphasizes the importance of the Sixth Amendment right identified in *Apprendi*, *see Booker*, 125 S. Ct. at 748-49, the application of the advisory guidelines regime that *Booker* adopts as a remedy does not depend on whether a defendant's Sixth Amendment rights have actually been violated, *see id.* at 769; *Hughes*, 401 F.3d at 553. Moreover, even if the remedy adopted in *Booker* were inextricably linked with the underlying Sixth Amendment defects that *Booker* found present in the mandatory guidelines regime, an *Apprendi* error itself is not structural. *See United States v. Carter*, 300 F.3d 415, 428 (4th Cir. 2002) (per curiam); *see also United States v. Perez-Ruiz*, 353 F.3d 1, 17 (1st Cir. 2003) (collecting cases), *cert. denied*, 124 S. Ct. 2058 (2004).[9]

---

[9]We note that in *Sullivan v. Louisiana*, 508 U.S. 275 (1993), the Supreme Court held that a defective reasonable doubt instruction was a structural error because, due to that instruction, the defendant received "no jury verdict of guilty-beyond-a-reasonable doubt," and thus there was "no object . . . upon which harmless-error scrutiny [could] operate." *Sullivan*, 508 U.S. at 280 (emphasis omitted). By contrast, a defendant sentenced under a mandatory guidelines regime has received a sentence in accordance with the guidelines—which remain valid post-*Booker*— and thus has not been wholly deprived of that to which he was entitled. At most, such a defendant has been deprived of the chance to receive a discretionary sentence (variance) outside the guideline range applied by the district court. But, that was the very opportunity denied the defendant in *Bros. Construction*, in which we held that the defendant failed to satisfy the third prong of plain-error review because it could not show that it was prejudiced by the denial of that opportunity. *See Bros. Constr.*, 219 F.3d at 320.

*Sullivan* also based its holding in part on the "necessarily unquantifiable and indeterminate" effect of the error. *Sullivan*, 508 U.S. at 282; *see United States v. Curbelo*, 343 F.3d 273, 281 (4th Cir. 2003) (holding that error of proceeding with fewer than 12 jurors absent the defendant's consent was structural error in part because effect of error was "'necessarily unquantifiable and indeterminate'" (quoting *Sullivan*, 508 U.S. at 282)). The errors in *Sullivan* and *Curbelo* deprived the defendants of having the issue of their guilt properly and fully decided by a jury, leading the courts in those cases to conclude that the prejudicial effect of the errors could never be reliably determined. *See Sullivan*, 508 U.S. at 281-82; *Curbelo*, 343 F.3d at 281-82. Here, the error of sentencing a defendant under a mandatory guidelines regime does not have an effect that is "necessarily unquantifiable and indeterminate" because in some cases the effect of this error will be apparent from the record. *See Gonzalez-Huerta*, 2005 WL 807008, at *4; *infra* Part III.D.

3.

Because we have concluded that the error of sentencing a defendant under a mandatory guidelines regime is neither presumptively prejudicial nor structural, we must determine whether White can demonstrate actual prejudice. *See Olano*, 507 U.S. at 735, 737. To do so, White must show that the error of sentencing him under a mandatory guidelines regime "affected the outcome of the district court proceedings." *Id.* at 734; *accord United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2339 (2004) (explaining that if an error is not structural, "relief . . . is tied in some way to prejudicial effect, and the standard phrased as 'error that affects substantial rights,' used in Rule 52, has previously been taken to mean error with a prejudicial effect on the outcome of a judicial proceeding").

The substantial rights inquiry conducted under Rule 52(b) is the same as that conducted for harmless error under Rule 52(a), with the important difference that the burden rests on the defendant, rather than the government, to prove that the error affected substantial rights. *See Olano*, 507 U.S. at 734-35; *United States v. Williams*, 81 F.3d 1321, 1326 (4th Cir. 1996) (noting that on plain error review, "the question whether a forfeited plain error was actually prejudicial is essentially the same as the question whether nonforfeited error was harmless—the difference being only in the party who has the burden on appeal to show the error's effect"). Our prejudice inquiry, therefore, is governed by the standard set forth by the Supreme Court in *Kotteakos v. United States*, 328 U.S. 750, 765 (1946), *i.e.*, whether "after pondering all that happened without stripping the erroneous action from the whole, . . . the judgment was . . . substantially swayed by the error."[10] *See Williams*, 81 F.3d at 1326.

We conclude that White has not met his burden of demonstrating

---

[10]As we emphasized in *Hughes*, the relevant inquiry under *Kotteakos* is not what sentence the district court might impose in an error-free proceeding on remand, but instead whether the error that occurred affected the sentence that was actually imposed. *See Hughes*, 401 F.3d at 551 (explaining that "the proper focus [of the prejudice inquiry] is on what actually happened as a result of the error, not what might happen in a subsequent proceeding on remand").

that he suffered actual prejudice from being sentenced under a mandatory guidelines regime. Although White received a sentence at the bottom of the applicable guideline range, the record as a whole provides no nonspeculative basis for concluding that the treatment of the guidelines as mandatory "affect[ed] the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203 (1992). The district court made no statements at sentencing indicating that it wished to sentence White below the guideline range but that the guidelines prevented it from doing so. In addition, the district court made certain statements suggesting that it was content to sentence White within the guideline range. For example, in rejecting White's argument that he should receive a reduction in his offense level for being a low-level participant in the conspiracy, the district court noted that White had received no upward adjustments for his role in the offense and that "the guidelines, therefore, properly comprehend his low-level participation." J.A. 809. Further, while the court acknowledged that White would have received a considerably lower sentence for a comparable offense in state court, it noted that the higher federal sentence "reflect[s] a reasoned judgment on the part of the Congress of the United States that drug trafficking represents a threat that has to be dealt with harshly." *Id.* at 814-15.

D.

In sum, the error of sentencing White under a mandatory guidelines regime does not warrant a presumption of prejudice, nor is it structural. And, White cannot demonstrate that he suffered actual prejudice from being sentenced under a mandatory regime. We therefore must conclude that this error did not affect White's substantial rights. *See Olano*, 507 U.S. at 735, 737. Because White cannot satisfy the third prong of plain-error review under *Olano*, we do not reach the fourth prong—whether the error "seriously affects the fairness, integrity or public reputation of judicial proceedings," *id.* at 732 (alteration & internal quotation marks omitted).[11]

---

[11]Our reasoning in *Hughes*—in which we elected to notice a prejudicial Sixth Amendment error of imposing a sentence exceeding the maximum authorized by the jury verdict alone—does not compel a different result. In analyzing the fourth plain-error prong in *Hughes*, we noted that

We recognize that our holding today will require defendants who argue for the first time on appeal that they were erroneously sentenced under the pre-*Booker* mandatory guidelines regime to demonstrate, based on the record, that the treatment of the guidelines as mandatory caused the district court to impose a longer sentence than it otherwise would have imposed. This requirement, however, does not place on defendants a burden more severe than that placed on defendants alleging other types of unpreserved errors. In some cases,

---

"[t]he record does not provide any indication of what sentence the district court would have imposed had it exercised its discretion under § 3553(a), treating the guidelines as merely advisory" and that the possibility that Hughes might receive the same sentence on remand was "not enough to dissuade us from noticing the error." *Hughes*, 401 F.3d at 556. However, our discussion of this point in *Hughes* was offered merely as further support for noticing a Sixth Amendment error that we had already determined to be prejudicial, *see id.* at 548-49. Indeed, the focus of our fourth prong inquiry was on this prejudicial effect: "As a result of a plain and prejudicial Sixth Amendment error, Hughes was sentenced to a term of imprisonment nearly four times as long as the maximum sentence authorized by the jury verdict." *Id.* at 555. In light of this substantial increase in Hughes' sentence, we concluded that "[t]here can be no doubt that failure to notice such an error would seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* By contrast, for the reasons already given, we cannot conclude that White's substantial rights were affected by the error of sentencing him under a mandatory guidelines regime, *cf. id.* at 553 (recognizing that the error of sentencing under a mandatory regime is "distinct from [a] Sixth Amendment claim"), much less that the degree of difference would be sufficient to compel us to notice the error.

statements by the district court may indicate that the treatment of the guidelines as mandatory prevented the court from imposing a lesser sentence. *See, e.g.*, *United States v. MacKinnon*, 401 F.3d 8, 10-11 (1st Cir. 2005) (holding that unpreserved error of sentencing under mandatory regime warranted remand because district court, upon imposing sentence at bottom of guideline range, stated that sentence was "unjust, excessive and obscene" (internal quotation marks omitted)); *Shelton*, 400 F.3d at 1328, 1332-33 (holding that defendant was prejudiced by unpreserved error of sentencing under mandatory regime because district court stated that sentence imposed at bottom of guideline range was "more than appropriate" (internal quotation marks omitted)); *Antonakopoulos*, 399 F.3d at 81 (collecting cases in which district courts expressed discontent with sentences mandated by guidelines and noting that "[w]here the district judge has said as much about a Guidelines sentence, that is a powerful argument for remand"). In other cases, the record will show that the treatment of the guidelines as mandatory did *not* result in an increased sentence. *See Antonakopoulos*, 399 F.3d at 81 (noting that remand is unlikely "if the district judge has said at sentencing that he would have reached the same result regardless of the mandatory nature of the Guidelines"); *see also United States v. Sayre*, 400 F.3d 599, 600-01 (8th Cir. 2005) (holding that error of sentencing under mandatory regime did not affect defendant's substantial rights because, in light of upward departure, district court "clearly imposed the sentence it felt appropriate on these facts," and therefore treatment of guidelines as mandatory "did not affect [defendant's] ultimate sentence"). And, in many cases—such as White's—the record will provide no nonspeculative basis for either conclusion, and therefore the defendant will not be able to satisfy the substantial rights prong of *Olano*. *See Jones*, 527 U.S. at 394-95 ("Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights."); *Hastings*, 134 F.3d at 243 (emphasizing that it is not sufficient for a defendant on plain error review to show that "it is impossible to tell whether" the error actually affected the outcome of the proceeding). That a defendant often will be unable to demonstrate prejudice is not unique to this type of error; rather, it is a function of the plain-error standard, which places the burden on *the defendant* to show prejudice when he has not preserved error in the district court. *See Olano*, 507 U.S. at 734 (explaining that placing the burden of showing prejudice on the defendant rather than the gov-

ernment is an "important difference" between plain-error and harmless-error review); *see also Booker*, 125 S. Ct. at 769 (expressing the view that not "every appeal will lead to a new sentencing hearing" because appellate courts will "apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test").

IV.

For the reasons set forth above, we affirm White's convictions and sentence.

*AFFIRMED*

DUNCAN, Circuit Judge, concurring in part and dissenting in part:

I thank Chief Judge Wilkins for his fine opinion, and appreciate the difficulty of the issues this and other courts are grappling with in the wake of the Supreme Court's decision in *United States* v. *Booker*, ___ U.S. ___, 125 S. Ct. 738 (2005). However, I am troubled by the majority's reliance on a distinction between the two manifestations of error discussed in *Booker* which the Supreme Court ultimately does not accept.[1] Because I believe that the Remedial Opinion in *Booker* does not recognize that distinction, and the majority opinion fails to clearly articulate another, I respectfully dissent from Part III.[2] The Error Opinion of *Booker* makes clear that in the wake of *Blakely*,

---

[1]I refer, of course, to the distinction between the error of treating the Guidelines as mandatory in which a judge finds facts that increase the defendant's sentence and the error of treating the Guidelines as mandatory in which judicial fact finding does not occur. Referring to the former as "Sixth Amendment error," a prior decision of this court notes: "after *Booker*, there are two potential errors in a sentence imposed pursuant to the pre-*Booker* mandatory guidelines regime: a Sixth Amendment error, which Hughes raised, and an error in failing to treat the guidelines as advisory, which Hughes does not raise." *United States* v. *Hughes*, 401 F.3d 540, 552 (4th Cir. 2005).

[2]I use the term "Remedial Opinion" to refer to the portion of the opinion authored by Justice Breyer, and the "Error Opinion" to refer to that authored by Justice Stevens.

defendants sentenced in federal court had a viable constitutional challenge to their sentences under the Sixth Amendment if the judge found facts that increased their sentence beyond that authorized by the jury's verdict alone. However, the Supreme Court declined to remedy the constitutional deficiency in purely Sixth Amendment terms. Instead of engrafting onto the existing system the Sixth Amendment jury trial requirement, as might have appeared to be the remedy suggested by the parameters of the error, the Remedial Opinion chose to strike 18 U.S.C. § 3553(b)(1) which makes the Guidelines mandatory. In adopting this remedy, the Supreme Court emphasized what it had also made clear in defining the error: that "the existence of § 3553(b)(1) is a necessary condition of the constitutional violation." *Booker*, ___ U.S. at ___, 125 S. Ct. at 764. In so doing, and in rejecting the argument of the United States that the advisory Guidelines regime be limited to "any case in which the Constitution prohibits judicial fact finding," the Court created a broader category of defendants eligible for resentencing than those for whom judicial fact finding increased their sentence. *Id.*

Following *Booker*, this court has decided that one segment of the total class of defendants authorized to seek resentencing can meet the stringent requirements of showing plain error and are therefore entitled to resentencing. In *United States* v. *Hughes*, 401 F.3d 540 (4th Cir. 2005), we held that defendants whose maximum sentences as authorized by the jury were less than that imposed by the judge based on facts found pursuant to the mandatory sentencing regime demonstrate prejudice. *Id.* at 548-89. *Hughes* specifically and appropriately states that it does not purport to address the issue of whether defendants sentenced under a mandatory regime could satisfy the plain error standard, as that issue was not before the court. *Id.* at 551 n.8. Significantly, however, we also noted that the record in Hughes did not provide "any indication of what sentence the district court would have imposed had it exercised its discretion under § 3553(a), treating the guidelines as merely advisory." *Id.* at 556. In determining whether the district court error warranted reversal, the court acknowledged that "[w]e simply do not know how the district court would have sentenced Hughes had it been operating under the remedial scheme announced in *Booker*." *Id.* at 556 n.14.

Although the error initially presented in *Booker* arose under the Sixth Amendment, the remedy provided was both broader and crafted to address its condition precedent—the mandatory character of the Guidelines. The distinction the majority creates here in my view fails to adequately reflect or address that underlying error, or the fact that *Booker* creates one class of defendants going forward. Because of that, I am unable to accept the majority's rationale for treating White's claim differently from Hughes's. Because *Hughes* concluded that one group of defendants sentenced under the now invalid § 3553(b)(1) must be resentenced, and I am unpersuaded by the majority's basis for distinguishing the remaining defendants, I am compelled to conclude that the latter subset, including White, must be remanded for resentencing as well.[3] *See United States* v. *Ruhe*, 191 F.3d 376, 388 (4th Cir. 1999) (noting panels of this court are "bound by prior precedent from other panels in this circuit absent contrary law from an en banc or Supreme Court decision").

---

[3]This, of course, would also be consistent with the Supreme Court's treatment of *Booker* and the companion case, *Fanfan*, in which there was no judicial fact finding.