**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

TERRANCE SMITH, a/k/a Ty,
*Defendant-Appellant.*

No. 03-4829

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RODNEY REEP, a/k/a Dirty Harry,
a/k/a Harry,
*Defendant-Appellant.*

No. 03-4878

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

KARL E. MOORE, SR.,
*Defendant-Appellant.*

No. 04-4117

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CR-02-217)

Argued: September 22, 2005

Decided: March 21, 2006

Before WILKINS, Chief Judge, LUTTIG, Circuit Judge, and
James C. DEVER, III, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

---

Affirmed by published opinion. Chief Judge Wilkins wrote the majority opinion, in which Judge Luttig joined. Judge Dever wrote an opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Kevin Michael Schad, SCHAD & SCHAD, Lebanon, Ohio; Jesse Edgar Demps, Portsmouth, Virginia; Andrew Michael Sacks, SACKS & SACKS, Norfolk, Virginia, for Appellants. Laura Marie Everhart, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Craig W. Sampson, Richmond, Virginia, for Appellant Karl E. Moore, Sr. Paul J. McNulty, United States Attorney, Michael J. Elston, Assistant United States Attorney, Norfolk, Virginia, for Appellee.

---

## OPINION

WILKINS, Chief Judge:

Karl E. Moore, Sr., Terrance Smith, and Rodney Reep (collectively, "Appellants") appeal their convictions and sentences in this drug conspiracy case. Concluding that all of Appellants' numerous arguments are without merit,[1] we affirm.

---

[1]Although we have considered all of Appellants' claims, some are so clearly without merit that they do not warrant discussion in this opinion. Any claim not discussed in the opinion, including those raised in pro se filings by Appellants, is summarily rejected.

## I.

The underlying facts are not directly pertinent to the issues raised on appeal and thus may be briefly stated. In 1997, Moore and his family moved from Arizona to the Tidewater area of Virginia. Moore opened a gas station and convenience store, which soon became a haven for gambling and drug dealing. Moore primarily dealt cocaine and cocaine base. Smith assisted Moore in the enterprise, often delivering large quantities of narcotics and collecting money from drug customers. Smith also stored drugs at his home for Moore.

After Reep was released from prison in May 2001, Moore assisted him in getting started in the drug business. (Moore and Reep were old friends, and Moore had supplied Reep with heroin for resale while Reep was in prison.) Reep worked at an automobile shop in the Tidewater area. Vehicles loaded with cocaine would be driven to the shop, where Reep would unload the cocaine. Moore paid Reep for his services in cocaine.

Each Appellant was convicted of conspiracy to possess with the intent to distribute cocaine, cocaine base, or heroin, *see* 21 U.S.C.A. § 846 (West 1999), and additional offenses. Moore was sentenced to life imprisonment; Smith and Reep were each sentenced to 360 months imprisonment.

## II.

We first consider Appellants' challenges to their convictions.

### A.   *Moore's Challenges*

#### 1.

Moore first argues that certain counts of his indictment were unconstitutionally vague. In particular, Moore challenges counts such as Count Four, which alleged that he possessed cocaine with the intent to distribute "[i]n or about Winter, 2000." J.A. 165. He maintains that he cannot be expected to mount a defense to a charge that does not identify a particular date.

An indictment meets the guarantees of the Fifth and Sixth Amendments "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. U.S.*, 418 U.S. 87, 117 (1974).[2] "Where a particular date is not a substantive element of the crime charged, strict chronological specificity or accuracy is not required." *U.S. v. Kimberlin*, 18 F.3d 1156, 1159 (4th Cir. 1994) (internal quotation marks omitted). Since time is not an element of possession with the intent to distribute and there is no argument that the statute of limitations had expired, *see U.S. v. Brewer*, 1 F.3d 1430, 1437 (4th Cir. 1993), the indictment was not unconstitutionally vague. *Accord U.S. v. Synowiec*, 333 F.3d 786, 791 (7th Cir. 2003) ("Where the indictment alleges that an offense allegedly occurred 'on or about' a certain date, the defendant is deemed to be on notice that the charge is not limited to a specific date. He therefore cannot make the requisite showing of prejudice based simply on the fact that the government has failed to prove a specific date." (internal quotation marks omitted)).

2.

Moore next asserts that the district court improperly admitted certain out-of-court statements made to Government witness William Henry Scott, IV. We conclude that Moore is not entitled to reversal of his convictions on this basis.

The Federal Rules of Evidence exclude from the definition of hearsay "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). "To admit testimony under this rule, a court must conclude (1) that there was a conspiracy involving the declarant and the party against whom admission of the evidence is sought and (2) that the statements at issue were made during the course of and in furtherance of that conspiracy." *U.S. v. Neal*, 78 F.3d 901, 905 (4th Cir. 1996) (internal quotation marks omitted).

---

[2]Citations in this opinion are according to ALWD & Darby Dickerson, *ALWD Citation Manual* (2d ed., Aspen Publishers 2003).

Moore challenges the admission of two statements to which Scott testified. First, Scott testified that in August 2002 Gregory Bonds called him and asked him to pick up two kilograms of cocaine that were in a closet in Bonds' home. Bonds told Scott that Moore had shipped the cocaine from Arizona to Virginia. Second, Scott testified about a conversation he had with Van Beasley, an associate of Moore's. When Scott observed Beasley with a quantity of cocaine and asked how he had obtained it, Beasley stated that Moore had robbed someone who owed him money.

Although Moore objected to the admission of the statement made by Bonds, he failed to object to the admission of Beasley's statement. We therefore review the admission of Bonds' statement for abuse of discretion, *see id.*, and the admission of Beasley's statement for plain error, *see* Fed. R. Crim. P. 52(b); *U.S. v. Olano*, 507 U.S. 725, 731-32 (1993). With respect to Beasley's statement, Moore must establish not only that an error occurred, but also that the error was plain and that it affected his substantial rights. *Olano*, 507 U.S. at 732. Even if Moore makes this three-part showing, correction of the error remains within our discretion, which we "should not exercise . . . unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration & internal quotation marks omitted).

Moore maintains that the Government failed to establish that Bonds and Beasley were part of the conspiracy, noting that Bonds was not named in the indictment and that there was no testimony that Bonds ever bought drugs from Moore. We agree with the Government that the evidence presented was sufficient for the jury to conclude that Moore, Scott, Bonds, and Beasley were all involved in the activities of the conspiracy.

Moore next claims that the statements were not made in furtherance of the conspiracy. "A statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." *U.S. v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994). For example, statements made by a conspirator to a non-member of the conspiracy are considered to be "in furtherance" of the conspiracy "if they are designed to induce that party either to join the conspiracy or to act in a way that

will assist it in accomplishing its objectives." *Id.* at 444. Most courts, including the Fourth Circuit, "construe the in furtherance requirement so broadly that even casual relationships to the conspiracy suffice to satisfy the exception." Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* vol. 5, §§ 801.34[5], 801-89 (Joseph M. McLaughlin ed., 2d ed., Matthew Bender 2005). In light of the broad construction of the "in furtherance" requirement, we conclude that the district court did not abuse its discretion in concluding that the statements by Bonds and Beasley were designed to further the conspiracy. We therefore affirm the admission of these statements.

3.

Moore next contends that the district court abused its discretion in allowing Moore's son, Karl Moore, Jr. (Moore, Jr.), to testify that at age six he "used to deliver drugs with DC [a friend of Moore's] on the bus to Phoenix, Arizona for my father." J.A. 667. Moore maintains that this was testimony regarding a prior bad act, in violation of Rule 404(b) of the Federal Rules of Evidence. Because Moore did not object to this testimony at trial, our review is for plain error.

Rule 404(b) provides that evidence of other crimes is inadmissible when it is offered to prove "the character of a person in order to show action in conformity therewith." This court has recognized that Rule 404(b) is primarily a rule of *inclusion*, not *exclusion*. *U.S. v. Queen*, 132 F.3d 991, 994-95 (4th Cir. 1997). "Evidence that is (1) relevant to an issue other than character; (2) necessary; and (3) reliable is admissible under Rule 404(b)." *U.S. v. Wells*, 163 F.3d 889, 895 (4th Cir. 1998) (internal quotation marks omitted). Evidence is necessary, even if it does not relate to an element of a charged offense, "when it furnishes part of the context of the crime." *Id.* at 896 (internal quotation marks omitted).

There was no violation of Rule 404(b) here. Moore, Jr.'s testimony provided part of the context of the crime and revealed the basis for Moore, Jr.'s knowledge of his father's drug operations. *See U.S. v. Palma-Ruedas*, 121 F.3d 841, 851-52 (3d Cir. 1997) (concluding that evidence of prior drug activity was admissible under Rule 404(b) because it "was a link in a chain of events that led to the charged conduct"). While Moore, Jr.'s testimony regarding his involvement in the

drug trade at age six no doubt reflected poorly on Moore, this prejudice did not outweigh the probative value of the evidence.

4.

Moore next asserts that the district court abused its discretion in excluding a witness, Shanika Simmons, on the basis that she violated an order sequestering witnesses. Moore does not dispute that Simmons violated the witness sequestration rule. He asserts, rather, that the sanction of exclusion was so disproportional to the violation as to be an abuse of discretion. *See U.S. v. Cropp*, 127 F.3d 354, 363 (4th Cir. 1997) (stating standard of review).

Simmons is Moore's daughter and was called as a witness on his behalf. The Government moved to exclude her as a witness on the basis that she had been present in the courtroom during testimony on two different days. After questioning Simmons under oath, the district court ruled that it would allow her to testify as to Moore's character but not as to any substantive issues. Moore then proffered that Simmons would have testified regarding Moore, Jr.'s various periods of incarceration, Moore's employment, and Moore's relationship with Moore, Jr.

A district court has three options for addressing a violation of a sequestration order. It can sanction the witness for contempt; ensure that the jury is aware of the violation through cross-examination by counsel or through instructions by the court; or exclude all or part of the witness' testimony. *U.S. v. Rhynes*, 218 F.3d 310, 323 (4th Cir. 2000) (en banc). Whatever remedy is employed must be proportional to the violation. *Id.* at 321.

Exclusion of a witness' testimony is "an extreme remedy" that "impinges upon the right to present a defense," and thus should be employed sparingly. *Id.* (internal quotation marks omitted). Here, the primary purpose of Simmons' testimony was to impeach the previous testimony of Moore, Jr. Although it was not clear how much time Simmons spent in the courtroom, there appears to be no dispute that she was not present—indeed, was not even in the courthouse—when Moore, Jr. testified. Therefore, it is not possible that Simmons could have tailored her testimony to Moore, Jr.'s in any way. *Cf. U.S. v.*

*Mongtomery*, 262 F.3d 233, 243-44 (4th Cir. 2001) (affirming exclusion of witness when it was not clear which witnesses she had heard testify). We therefore conclude that the district court abused its discretion in altogether excluding Simmons' testimony.

The error was harmless, however. The parties stipulated regarding the periods of time when Moore, Jr. was in prison. And, several other witnesses testified regarding Moore's legitimate business activities and his relationship with Moore, Jr. Accordingly, Simmons' testimony would have been cumulative. *See U.S. v. Bales*, 813 F.2d 1289, 1296 (4th Cir. 1987).

5.

During its rebuttal closing argument, the Government made the following statements:

> You know the old saying about birds of a feather. Well, the defendants chose this flock. They criticize these witnesses, but the reason they are witnesses is because they are the customers and acquaintances chosen by the defendant to associate with. . . .

.     .     .

> *Now, all of these defendants are guilty, just as . . . many of the witnesses[ ] are guilty of being drug dealers and being part of this conspiracy. It's just a matter of degree. The only difference is some who sat on that witness stand admitted it and those sitting at these two tables have not.*

J.A. 2241-42 (emphasis added). No objection was raised when this argument was made. Moore now argues that the emphasized comments were improper because they are a statement of "a specific personal belief by the Government[ that] the Appellant is guilty of the offenses." Supp. Br. of Appellant Karl E. Moore, Sr. at 6 (Sept. 13, 2004).[3]

---

[3]Moore also maintains that the Government's statements "impermissibly comment on the Appellant's right to put the Government to its burden of proof, and not testify on his own behalf." *Id.* We conclude that the Government's argument cannot fairly be construed as commenting on these matters.

In order to obtain a new trial on the basis of prosecutorial misconduct, Moore must demonstrate that the Government's remarks were, in fact, improper and that the remarks prejudiced him. *U.S. v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993). An assessment of prejudice requires the court to consider

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*Id.* at 241 (internal quotation marks omitted). Because Moore failed to object at trial, the ordinary test for reversal based on improper argument is augmented in that Moore must also show that the impropriety of the argument was plain. And, even if Moore satisfies these requirements, the court retains discretion to decline to notice the error.

"As a general premise, a prosecutor's repeated references to his or her personal opinion about a defendant may indeed be found improper." *U.S. v. Higgs*, 353 F.3d 281, 332 (4th Cir. 2003), *cert. denied*, 125 S. Ct. 627 (2004). It is permissible—although not preferable—for a prosecutor to argue his belief that the evidence proves the defendant's guilt. *U.S. v. Pupo*, 841 F.2d 1235, 1240 (4th Cir. 1988) (en banc); *cf. U.S. v. Sherrill*, 388 F.3d 535, 538 (6th Cir. 2004) (holding that statement, "that man is guilty," was not improper because phrase was prefaced by "the government submits to you" (internal quotation marks omitted)). What the prosecutor may not do is suggest a belief in the defendant's guilt that is not explicitly tied to the strength of the evidence, because such an argument may suggest to the jury that the prosecutor has independent knowledge of the defendant's guilt. 75A Am. Jur. 2d *Trial* § 634 (Westlaw 2005); *see Pupo*, 841 F.2d at 1240.

The Government's remarks here were made in response to Appellants' challenges to the witnesses' truthfulness in their closing arguments. *Cf. Higgs*, 353 F.3d at 332 (holding that argument about what defendant's life in prison would be like was not improper, in part

because argument responded to defense claims about prison life). Nevertheless, it is arguable that the Government's assertion of guilt was improper. *But cf. U.S. v. Passero*, 290 F.2d 238, 245 (2d Cir. 1961) (holding that argument that "when you walk like a duck, talk like a duck, and you look like a duck, you are a duck" was not improper when made in response to defense claim that prosecution was relying on guilt by association (internal quotation marks omitted)). Even if the argument was improper, however, there was no prejudice. The remark was isolated, occurring at the beginning of a lengthy rebuttal argument. And, given the context in which the argument was made, it is unlikely that it had any measurable tendency to mislead the jury, nor does it appear that the prosecutor had any intention to divert the attention of the jury.

## B.   *Reep's Challenges*[4]

### 1.

Reep first argues that the charges against him should have been dismissed on double jeopardy grounds. We disagree.

Reep initially was indicted separately from the other Appellants. Just before jury selection began for Reep's trial, the Government informed the district court that Government witness Curtis Roberson had failed to appear despite his promise to do so. The court issued a material witness warrant, and Roberson was taken into custody. The court conducted a hearing, at which Roberson testified that he was "confused" regarding his duty to appear. J.A. 233. Roberson also testified that he was taking numerous medications, including an anticonvulsant, an antidepressant, and an antipsychotic. The district court directed that Roberson be taken into custody as a material witness. After the jury was sworn, the court learned that Roberson had not been provided with his medications during the five days he had been in custody. The court questioned Roberson, who stated that he felt "[a] little weak," *id.* at 243, and somewhat confused. The court granted Reep's request for a mistrial on the ground that Roberson's competency was suspect and he needed a psychiatric evaluation.

---

[4]Smith raised one challenge to his conviction, which we have considered and rejected. *See supra* n. 1.

Thereafter, Reep was indicted along with the other Appellants. Prior to trial, Reep moved to bar retrial on double jeopardy grounds, arguing that he had been forced to move for a mistrial by the Government's failure to ensure that Roberson was provided with his medications. Reep argued that even if the Government did not intend to provoke a mistrial, its conduct had been so reckless as to be "the functional equivalent of" intent to cause a mistrial. *Id.* at 221. The district court denied the motion.

While Reep now concedes the absence of any evidence that the Government acted with intent to provoke a mistrial, he continues to press his claim that the Government was so reckless in not ensuring delivery of Roberson's medications that it should be deemed to have acted intentionally. We disagree.

The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This clause protects a criminal defendant from facing "repeated prosecutions for the same offense," *Or. v. Kennedy*, 456 U.S. 667, 671 (1982), and accordingly, the government is generally allowed only one opportunity to compel a defendant to stand trial, *Ariz. v. Washington*, 434 U.S. 497, 505 (1978). However, the Double Jeopardy Clause does not apply when a defendant requests or consents to a mistrial, unless the prosecutor has engaged in conduct intended to provoke a mistrial. *Kennedy*, 456 U.S. at 675-76. The *Kennedy* intent exception is reserved for conduct "intended to 'goad' the defendant into moving for a mistrial." *Id.* at 676. Further, the defendant bears the burden of proving that the prosecution acted with specific intent to provoke a mistrial. *U.S. v. Borromeo*, 954 F.2d 245, 247 (4th Cir. 1992).

Reep provides no support for his claim that reckless conduct can be equated to intentional provocation of a mistrial request. Even if we were to accept this proposition, however, the facts here do not support a finding of recklessness. Officials at the local jail where Roberson was housed assured the Government that Roberson would receive his medications. The Government sought to ensure that Roberson received his medications by offering to obtain the medications and bring them to the jail—an offer that the jail refused because it prohibits anyone from bringing medications into the jail. Additionally, the

United States Marshal Service requested that a doctor examine Roberson. It thus cannot be said that the Government was reckless with respect to Roberson's need to be provided with his medications.

2.

Reep next complains that the district court erred in restricting his cross-examination of certain witnesses. We conclude that the district court did not abuse its discretion. *See U.S. v. Turner*, 198 F.3d 425, 429 (4th Cir. 1999) (stating standard of review).

The Constitution guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the [defendant] the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (emphasis & internal quotation marks omitted). Indeed, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316. Nevertheless, the district court retains "wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Del. v. Van Arsdall*, 475 U.S. 673, 679 (1986). With these principles in mind, we review Reep's particular claims.

a. *Karl E. Moore, Jr.*

Moore, Jr. testified about Reep's involvement in the conspiracy during the summer and fall of 2001. According to this testimony, Moore wanted to help Reep reestablish himself in the drug business following his release from prison in May 2001. Moore provided Reep with cocaine to sell in exchange for Reep accepting deliveries of cocaine and for allowing the conspiracy to use an automobile paint shop where he worked to remove cocaine that had been concealed in vehicles.

On cross-examination, Reep's counsel questioned Moore, Jr. at length about his agreement to cooperate with the Government, his

truthfulness, and his ability to accurately recall the events of the summer of 2001. The district court first asked Reep's counsel to conclude cross-examination after he had been questioning Moore, Jr. for approximately one hour. Reep's counsel proceeded with further cross-examination concerning statements Moore, Jr. had made when he was arrested. The court directed counsel to move on after the Government stipulated that this questioning had laid an adequate foundation for a subsequent witness' testimony. Counsel asked a few more questions, and then closed his cross-examination.

The district court did not abuse its discretion in limiting cross-examination. Reep was allowed to thoroughly explore issues relating to Moore, Jr.'s recall of events and his motives for testifying. Any further testimony on these subjects would have been cumulative. *See U.S. v. Lancaster*, 96 F.3d 734, 744-45 (4th Cir. 1996) (en banc) (holding that district court did not abuse its discretion in precluding further inquiry into contents of police officer's disciplinary file because further inquiry would have been cumulative).

#### b.  *Law Enforcement Witnesses*

During a recess, Reep's attorney observed two Government witnesses, Officer Heath Eckstein (who had just testified) and Officer John Poch (who was about to testify), talking in the hallway. According to counsel, the officers were "going over a report" that Officer Eckstein held in his hand. J.A. 1393. Although the court allowed Reep's counsel to question Officer Poch regarding the conversation, after counsel exceeded the bounds set by the court for this examination, the court questioned the officers. Both officers—who were partners in the investigation of the conspiracy—admitted having a conversation, but denied discussing the trial.[5] The court refused to allow Reep's counsel to further cross-examine the officers about their

---

[5]We will assume *arguendo* that discussion of the case by the officers would have violated the sequestration order entered by the district court. *See U.S. v. Sepulveda*, 15 F.3d 1161, 1175-76 (1st Cir. 1993) (explaining that Federal Rule of Evidence 615 governs only exclusion of witnesses from the courtroom; it is within the discretion of the trial court to order additional restrictions such as prohibiting witnesses from discussing the case *outside* the courtroom).

conversation. Reep contends that this refusal was an abuse of discretion.

When a party alleges a violation of a sequestration order, the court may allow the matter to be explored through cross-examination. *U.S. v. Sepulveda*, 15 F.3d 1161, 1175 n. 8 (1st Cir. 1993). The party alleging a violation bears the burden of demonstrating that a violation in fact occurred. *U.S. v. Meggers*, 912 F.2d 246, 250 (8th Cir. 1990). Here, both Reep's counsel and the district court examined the officers regarding the potential violation of the sequestration order without producing any indication that the officers had discussed the case. The district court did not abuse its discretion in prohibiting further cross-examination.[6]

### c.   *Other Witnesses*

Each time a Government witness testified about the conspiracy without mentioning Reep, Reep's counsel cross-examined the witness about the witness' lack of knowledge of Reep's involvement. After several of these instances, the district court concluded that such examination was beyond the scope of direct, and refused to allow Reep's counsel to continue in this manner.

This ruling was not an abuse of discretion. Nothing precluded Reep's counsel from arguing to the jury that witnesses knowledgeable about the conspiracy had not identified Reep. He did not need to cross-examine such witnesses in order to make this point.

---

[6]Reep also challenges the following cautionary instruction, which the court gave to the jury after Reep questioned Officer Poch regarding his conversation with Officer Eckstein: "Ladies and gentlemen, one cautionary instruction. There's been some references to Officer Eckstein and this witness. There's no evidence before this court of any witness collusion or tampering between Officer Eckstein and this officer leaving the stand." J.A. 1417. Because there was no evidence to support a sequestration order violation, this instruction was proper to avoid confusion. *Cf. Anderson v. Griffin*, 397 F.3d 515, 520 (7th Cir. 2005) (identifying cautionary instructions as one means of avoiding juror confusion).

3.

Reep next maintains that he was denied a fair trial by the excessive interference of the district court. For example, with respect to Reep's cross-examination of Moore, Jr., Reep contends that "[o]n at least fourteen(14) occasions . . . the district court interrupted counsel's cross-examination *sua sponte* and without government-initiated objection." Br. of Appellants at 51 (July 23, 2004). Reep maintains that on these occasions counsel was "unfairly rebuk[ed]" and "chid-[ed]." *Id.* Reep also maintains that the district court should not have intervened in counsel's questioning of Reep's expert witness. When, as here, the defendant objects to interference by the district court, review is for abuse of discretion.[7] *U.S. v. Castner*, 50 F.3d 1267, 1272 (4th Cir. 1995).

Rule 614(b) of the Federal Rules of Evidence provides that a district court may interrogate witnesses called by the parties. Additionally, the court is required to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence." Fed. R. Evid. 611(a). The court must exercise this control in order to "make the interrogation and presentation effective for the ascertainment of the truth" and to "avoid needless consumption of time." *Id.*; *see id.* (providing that control also may be exercised to "protect witnesses from harassment or undue embarrassment"). Nevertheless, it is critically important that the court "retain the general atmosphere of impartiality required of a fair tribunal." *U.S. v. Godwin*, 272 F.3d 659, 678 (4th Cir. 2001) (internal quotation marks omitted). When the district court oversteps its bounds to the prejudice of the defendant, a violation of due process has occurred. *Id.* at 679.

---

[7]Although Reep's counsel did not object every time the district court interjected a question or a comment, counsel repeatedly made clear during sidebar discussions that he felt he was being treated unfairly by the court. *Cf.* Fed. R. Evid. 614(c) (noting that an objection to interrogation of witnesses by the court can be made at the time of questioning "or at the next available opportunity when the jury is not present").

### a.   *Cross-examination of Moore, Jr.*

Reep first complains of the manner in which the district court inter-vened in his counsel's cross-examination of Moore, Jr. On several occasions, the district court interrupted cross-examination—*e.g.*, by admonishing counsel that a question had been asked and answered. We have carefully reviewed the transcript, and we find nothing improper in the actions of the court. Counsel's cross-examination of Moore, Jr. was repetitive in the extreme, and the district court was well within its discretion to attempt to curb counsel's tendency to ask the same question over and over.

### b.   *Examination of Pharmacologist*

Reep called a professor of pharmacology, Dr. William Cooke, as an expert regarding the drugs Government witness Roberson was tak-ing and their potential effect. After listing the psychoactive drugs Roberson was taking, Dr. Cooke testified that taking the drugs in ther-apeutic dosages could result in confusion, decreased reasoning capac-ity, and short-term memory loss. After cross-examination by the Government, the district court engaged in the following colloquy with Dr. Cooke:

> THE COURT:  . . . [A]re these compounds used to treat people suffering from bipolar disease?
>
> THE WITNESS:  They can be used for that purpose, yes.
>
> THE COURT:  And when these particular drugs are used, psychiatrists are trained to prescribe these drugs in the appropriate dosage; is that correct?
>
> THE WITNESS:  Yes. From experience, that's right.
>
> THE COURT:  And the psychiatrist not only prescribed these drugs, but they are required to monitor these drugs to be sure that they are having the effect that they prescribed them for in the first place; is that correct?

THE WITNESS:    That would be the ideal circumstance, yes.

J.A. 2190. On redirect, Reep's counsel established that monitoring of the patient does not necessarily mean that the patient will not suffer the cognitive effects described in Dr. Cooke's direct testimony.

Reep complains that the questioning by the district court blunted Dr. Cooke's testimony by making the jury think that monitoring would avoid any adverse effects on Roberson's memory. To the extent this is true, however, Reep's counsel established on redirect that memory loss could occur even with physician monitoring. Additionally, Roberson's difficulties with his memory were evident from his testimony for the Government, and were further illuminated by counsel's extensive cross-examination.

### c.   *Cumulative Effect*

Reep also maintains that even if the district court did not abuse its discretion in any particular instance, he was prejudiced by the cumulative effect of the interventions by the court. Any such cumulative effect, however, was ameliorated by the instructions to the jury. In its pre-trial instructions, the district court informed the jury,

> [I]t is sometimes the duty of the Court to admonish or warn an attorney who out of zeal for his or her cause does something which is not in keeping with the rules of evidence or procedure. If this should happen, do not permit this to have any effect on your evaluation of the merits of any evidence that comes before you.

*Id.* at 384. Additionally, during the jury charge, the court reminded the jurors that

> it is the duty of the Court to admonish an attorney who out of zeal for his or her cause does something which the Court believes is not in keeping with the Rules of Evidence or Procedure. You are . . . to draw absolutely no inference against the side to whom an admonition of the Court may have been addressed during the trial of this case.

*Id.* at 2373-74. Jurors are presumed to adhere to cautionary instructions issued by the district court. *U.S. v. Abdullah*, 162 F.3d 897, 904 (6th Cir. 1998).

4.

Reep's counsel began presentation of Reep's case on the afternoon of the seventh day of trial. After counsel had presented several witnesses, he informed the court that he had eight more witnesses; counsel stated, "I don't think there will be any problem finishing today." J.A. 2093. After Reep's counsel had presented five more witnesses, he represented that he had three remaining; further discussion with the court reduced this number to two. Counsel stated, "The last witness I have is . . . Dr. Cooke." *Id.* at 2170. Following Dr. Cooke's testimony, however, counsel informed the court that he needed to "think about" presenting "one or two" more witnesses before he was prepared to rest. *Id.* at 2194. The court insisted that counsel decide immediately whether he would present additional witnesses; after counsel declined to do so, the court declared that Reep's case was rested. Reep appeals this ruling as an abuse of discretion, *see U.S. v. Janati*, 374 F.3d 263, 273-74 (4th Cir. 2004), arguing that counsel should have been allowed to consider the matter during the evening recess and rest or present additional witnesses the following morning.[8]

We conclude that there was no abuse of discretion here. Reep's counsel repeatedly and unequivocally stated that he did not plan to call any witnesses after Dr. Cooke. In light of these representations, and given that the court day was not yet finished, it was not improper for the district court to insist that Reep either present additional witnesses at that time or rest his case. Reep's complaint that the Government was treated with more deference is unavailing. After the Government completed its case in chief, the district court allowed the Government to delay the formal act of resting its case to the following

---

[8]Reep's attorney challenges the $1,000 sanction imposed by the district court after he continued to dispute the matter. This is not the proper forum for such a challenge, however. *See Rogers v. Natl. Union Fire Ins. Co.*, 864 F.2d 557, 559-60 (7th Cir. 1988) (holding that an attorney who is sanctioned must appeal in his own name in order to create appellate jurisdiction over the sanctions order).

morning so that the Government could ensure that its exhibits were in order. The Government made clear that it was willing to rest its case that afternoon, however, and did not indicate a desire to consider calling additional witnesses. Thus, Reep was not treated unfairly in comparison to the treatment the Government received.

5.

During his closing argument, Reep's counsel gave the jury four definitions of reasonable doubt. During the fourth definition, the district court interjected, saying, "I hate to interrupt you, but not even the Court is permitted to define reasonable doubt in the Fourth Circuit for the jury, so, respectfully, do not attempt to define it for them." J.A. 2277. The court then referred to counsel's definition of reasonable doubt while instructing the jury:

> Now, ladies and gentlemen, let me say one more word about reasonable doubt. You've heard the concept of reasonable doubt. During the closing arguments [counsel for Reep] attempted to define the word reasonable doubt. The law for the Court is simple. The Court is not permitted to attempt to define the word reasonable doubt. . . . And that is because the courts have found that the definition is a self-evident definition and there is no better way of explaining the concept. All efforts to explain reasonable doubt simply lead[ ] to more confusion. So you're not bound to accept [counsel's] definitions of reasonable doubt. So not even the Court is going to attempt to give you that definition. So we're telling you to rely on your reasonable understanding of the concept of the word reasonable doubt. It's a self-evident definition.

*Id.* at 2338-39. Reep now argues that the district court abused its discretion in interrupting closing argument and in instructing the jury that the argument was improper. *See U.S. v. Patterson*, 150 F.3d 382, 389 (4th Cir. 1998) (stating standard of review).

"It is well settled in this circuit that a district court should not attempt to define the term 'reasonable doubt' in a jury instruction absent a specific request for such a definition from the jury." *U.S. v.*

*Oriakhi*, 57 F.3d 1290, 1300 (4th Cir. 1995). A district court may also restrict counsel from defining the phrase. *Patterson*, 150 F.3d at 389. Here, the district court allowed counsel to define reasonable doubt three times, prohibiting only the presentation of a fourth definition. There was no abuse of discretion.

### III.

Having concluded that Appellants' convictions should be affirmed, we now turn to their challenges to their sentences. Appellants argue that under *United States v. Booker*, 125 S. Ct. 738 (2005), the district court erred by imposing sentences that exceeded the maximum autho-rized by the jury verdict alone. Because Appellants did not raise this issue in the district court, our review is for plain error. *See* Fed. R. Crim. P. 52(b); *Olano*, 507 U.S. at 731-32. To establish plain error, Appellants must show that an error occurred, that the error was plain, and that the error affected their substantial rights. *Olano*, 507 U.S. at 732. If they can make such a showing, correction of the error remains within our discretion, which we "should not exercise . . . unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration & internal quotation marks omit-ted).

### A.   *Moore's Sentence*

As we recently held in *United States v. Hughes*, 401 F.3d 540, 547-49 (4th Cir. 2005), a district court commits plain error that affects a defendant's substantial rights when, operating under a pre-*Booker* mandatory guidelines regime, it imposes a sentence that exceeds the maximum guideline sentence authorized by the jury verdict alone. At first glance, it would appear that Moore has satisfied this standard. At sentencing, the district court found Moore responsible for 1,053,269 kilograms of marijuana, for a base offense level of 38. *See U.S. Sentencing Guidelines Manual* § 2S1.1(a)(1) (2002) (directing that the offense level for money laundering is the offense level for the offense from which the laundered funds were derived); *id.* § 2D1.1(c)(1) (pro-viding that the base offense level for 30,000 kilograms or more of marijuana is 38); *id.* § 2D1.1, comment. (n.10) (drug equivalency table). The district court also assessed an additional ten offense levels, finding that Moore had a leadership role in the conspiracy, *see*

U.S.S.G. § 3B1.1(a), used a minor in the commission of the crime, *see* U.S.S.G. § 3B1.4, possessed a firearm in connection with the offense, *see* U.S.S.G. § 2D1.1(b)(1), and was convicted under 18 U.S.C.A. § 1956, *see* U.S.S.G. § 2S1.1(b)(2)(B). Moore's total offense level of 48, combined with his criminal history category of III, yielded a guideline range of life imprisonment.[9]

In contrast, the special verdict returned by the jury—which included specific findings concerning drug quantity as to some counts —authorized a guideline range of 292-365 months. This sentencing range corresponds to a base offense level of 34 (based on drug quantity) plus the two-level enhancements for possession of a firearm and conviction under § 1956 (neither of which, the parties agree, required additional judicial fact finding), for a total offense level of 38, and Moore's criminal history category of III. Because the life sentence imposed on Moore exceeds the maximum sentence authorized by the facts found by the jury alone, it would appear that Moore's Sixth Amendment rights were violated. *See Hughes*, 401 F.3d at 547.

The Government maintains, however, that there is no Sixth Amendment violation because the drug quantities *charged in the indictment* correspond with a base offense level of 36. When the firearm and § 1956 enhancements are added and combined with Moore's criminal history category, the resulting guideline range is 360 months to life imprisonment. Thus, the Government argues, Moore's life sentence does not exceed the maximum authorized by the facts found by the jury alone. *See U.S. v. Evans*, 416 F.3d 298, 300-01 (4th Cir. 2005).

We might find the Government's argument more persuasive if the district court had instructed the jury to determine Moore's guilt as charged in the indictment, or had at least directed the attention of the jury to the amounts charged in the indictment. This did not occur, however. Rather, in instructing the jury on the elements of the drug offenses, the district court made no reference at all to drug quantity. Moreover, when it instructed the jury regarding the quantities listed on the special verdict form as to some counts, the district court did not instruct the jury regarding the language of the indictment; it sim-

---

[9]Moore does not challenge his criminal history category.

ply charged the jury that it was required to make findings beyond a reasonable doubt *as to the quantities listed in the special verdict form. See* J.A. 2349. These quantities corresponded to the various quantities set forth in 21 U.S.C.A. § 841 (West 1999 & Supp. 2005), not to the indictment. In light of these facts, we cannot accept the Government's argument that Moore's convictions alone are sufficient to establish the absence of a Sixth Amendment violation.

Nevertheless, we decline, pursuant to *Johnson v. United States*, 520 U.S. 461 (1997), and *United States v. Promise*, 255 F.3d 150 (4th Cir. 2001) (en banc), to notice the plain error established by Moore. In *Johnson*, the Supreme Court considered on plain error review a perjury conviction in which the element of materiality was found by a judge rather than by the jury. *See Johnson*, 520 U.S. at 463. The Court ruled that the error was plain and assumed that it affected substantial rights. *See id.* at 468-69. The Court declined to notice the error, however, because the evidence concerning the omitted element was "overwhelming" and "essentially uncontroverted." *Id.* at 470 (internal quotation marks omitted). The Court reasoned that, under the circumstances, *noticing* the error would "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings" because "[r]eversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it." *Id.* (internal quotation marks omitted).

In *Promise*, we refused to vacate the defendant's sentence on plain error review despite the fact that the use of judge-made drug-quantity findings by the district court had created a Sixth Amendment violation. *See Promise*, 255 F.3d at 161-64. Following *Johnson* as well as similar circuit precedent, we reasoned that "[t]here simply can be no doubt that had the indictment included the [requisite drug quantity], the jury would have found Promise guilty beyond a reasonable doubt." *Id.* at 164.

The reasoning of *Johnson* and *Promise* applies with equal force here. Even though the Sixth Amendment required that the jury, rather than the trial judge, make the drug quantity findings that increased Moore's sentence, the evidence concerning drug quantity was overwhelming and uncontroverted, even at sentencing. And, while Moore challenged his guilt of the charged offenses, he did not maintain any

challenge to the evidence concerning the quantity of drugs involved in the transactions to which various witnesses testified. There can be no question that the jury, having found that the offenses were committed, would have also determined that the offenses involved the specific amounts charged in the indictment. *Cf. United States v. Cotton*, 535 U.S. 625, 632-34 (2002) (declining to notice plain Fifth Amendment error on the basis that evidence concerning drug quantity was "overwhelming and essentially uncontroverted" (internal quotation marks omitted)). *But see United States v. Davis*, 407 F.3d 162, 164 & n.3 (3d Cir. 2005) (en banc) (suggesting, without discussing *Johnson*, that Sixth Amendment *Booker* violation should be noticed on plain error review even if evidence supporting judge-made findings was overwhelming and essentially uncontroverted); *United States v. Oliver*, 397 F.3d 369, 380 n.3 (6th Cir. 2005) (declining to consider whether error should not be noticed on the basis of overwhelming and uncontroverted evidence; distinguishing *Cotton*). We therefore affirm Moore's sentence.[10]

---

[10]The dissent asserts that "[e]ssentially, *Hughes* and its progeny hold that all . . . *Booker* Sixth Amendment errors require a remand in those instances where it is unclear what sentence the district judge would have imposed had the guidelines been advisory." Post, at 33. This is incorrect. Although we indicated in *Hughes* that we might not notice a Sixth Amendment error if the record clearly demonstrated that the district court would have imposed the same sentence had it treated the guidelines as advisory, *see Hughes*, 401 F.3d at 555, this court has never held—in *Hughes* or any subsequent case—that this would be the only circumstance under which we might decline to notice such an error.

Similarly unavailing is the dissent's observation that no Fourth Circuit decision noticing a plain Sixth Amendment *Booker* error has explicitly considered whether the evidence was overwhelming and essentially uncontroverted. We simply cannot take silence as an indication that they decided such an inquiry was improper. Even if that is one possible inference, it is equally plausible that the issue was not presented or that the evidence was not overwhelming or uncontroverted. Nor is it relevant that in *United States v. Cardwell*, 433 F.3d 378, 392-93 (4th Cir. 2005), the panel noticed a plain Sixth Amendment *Booker* error without determining whether the "overwhelming" and "essentially uncontroverted" nature of the evidence warranted refusing to notice the error. The *Cardwell* panel eschewed this inquiry—despite its strength "both in the abstract and on the facts of this case"— only because the Government "expressly abandoned" the argument. *Id.* at 392 n.7.

### B.   *Smith's Sentence*

Smith argues that he was sentenced in violation of the Sixth Amendment because the jury was not required to make findings regarding the extent of his involvement in the conspiracy. He correctly maintains that the Fourth Circuit has held that a defendant charged with conspiracy is entitled under the Sixth Amendment to a jury determination of the quantity of drugs attributable to him as an individual, rather than the quantity for which the conspiracy as a whole was responsible. *See U.S. v. Collins*, 415 F.3d 304, 311-14 (4th Cir. 2005).

However, because Smith was sentenced as a career offender, his offense level was not based on the quantity of drugs attributable to him, but rather on the maximum sentence for the offense of conviction. *See* U.S.S.G. § 4B1.1(b). As Smith acknowledges, the jury properly made a finding as to drug quantity with respect to Count 31 of the indictment, which charged him with possessing with the intent to distribute ten kilograms of cocaine. Because the maximum sentence for this offense is life imprisonment, *see* 21 U.S.C.A. § 841(b)(1)(A), the corresponding offense level is 37. This, combined with the mandatory Criminal History Category of VI, produced a guideline range of 360-life. The district court sentenced Smith to 360 months. Therefore, because Smith's sentence did not exceed the maximum authorized based on the facts charged in the indictment and found by the jury beyond a reasonable doubt, his Sixth Amendment rights were not violated.

Smith also challenges his sentence under *Booker*. However, Smith's entire argument consists of the following sentence: "Smith's sentence exceeded the maximum sentence then authorized by the facts found by the jury alone, in violation of *Booker*." Supp. Br. of Appellant 3 (Aug. 30, 2005). This argument does not comply with Rule 28(a)(9)(A) of the Federal Rules of Appellate Procedure, which requires the argument section of an appellant's brief to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Thus, we deem Smith to have abandoned this claim. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n. 6 (4th Cir. 1999).

Even if properly made, Smith's claim would fail. In *United States v. Collins*, 412 F.3d 515, 522-23 (4th Cir. 2005), we held that a career offender sentence does not violate the Sixth Amendment when it is clear from the face of the record that the qualifying convictions were felonies that were crimes of violence or controlled substance offenses. Here, Smith had two convictions for aggravated assault and one for selling narcotics. Smith does not dispute that the district court did not need to make additional findings in order to determine that these were qualifying convictions under the career offender guideline. Accordingly, there was no Sixth Amendment violation in sentencing Smith as a career offender.

## C.  *Reep's Sentence*

Reep, like Smith, was sentenced as a career offender. He argues that the district court erred in sentencing him pursuant to a mandatory guidelines scheme. This was, as we have previously held, plain error. *U.S. v. White*, 405 F.3d 208, 216-17 (4th Cir.), *cert. denied*, 74 U.S.L.W. 3302 (U.S. Nov. 14, 2005) (No. 05-6981). However, Reep must also demonstrate prejudice by showing "that the treatment of the guidelines as mandatory caused the district court to impose a longer sentence than it otherwise would have." *Id.* at 224. Reep cannot do so. At sentencing, the district court commented that the sentence of 360 months "is appropriate[ ] [g]iven your background and the nature of the offense." J.A. 2514. This statement certainly does not support a claim that the district court would have imposed a lesser sentence in the exercise of its discretion. We therefore affirm Reep's sentence.

## IV.

For the reasons set forth above, we affirm Appellants' convictions and sentences.

*AFFIRMED*

DEVER, District Judge, concurring in part and dissenting in part:

I respectfully dissent from the failure to notice the error in defendant Moore's life sentence, vacate Moore's sentence, and remand for

resentencing. *See* Majority Opinion at 20-22. In all other respects, I concur in the majority opinion.

I.

In *United States v. Hughes*, 401 F.3d 540, 547 (4th Cir. 2005), the Fourth Circuit set forth its approach to analyzing *Booker* Sixth Amendment violations raised for the first time on direct appeal. This case is the first post-*Hughes* case in which the Fourth Circuit has applied *Hughes*, held that a *Booker* Sixth Amendment violation took place, recognized that the record fails to reflect what Moore's sentence would have been under an advisory scheme, yet declined to exercise its discretion to notice the error, vacate the illegal sentence, and remand for resentencing. Although declining to notice a *Booker* Sixth Amendment violation is not uncommon in those circuit courts that have adopted a different approach to analyzing plain-error issues arising from such *Booker* Sixth Amendment violations raised for the first time on direct appeal, the result in this case is materially inconsistent with *Hughes* and its progeny.

In *Hughes*, the Fourth Circuit set forth its approach to analyzing plain error as to *Booker* Sixth Amendment violations raised for the first time on direct appeal. The court held that such *Booker* Sixth Amendment violations meet the three-part plain-error test under cases such as *United States v. Olano*, 507 U.S. 725, 731-34 (1993) ((1) Did an error occur? (2) Was the error "plain"? and (3) Did the error actually affect the outcome of the proceedings?). *See Hughes*, 401 F.3d at 547-55. Once those three parts are satisfied, the *Hughes* court discussed the discretionary fourth part of plain-error analysis and stated:

> [I]t remains within our discretion to determine whether the district court error warrants reversal. Our discretion is appropriately exercised only when failure to do so would result in a miscarriage of justice, such as when a defendant is actually innocent or the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Hughes*, 401 F.3d at 555 (quotation omitted). In exercising that discretion in *Hughes*, the panel noted that because of the "plain and prejudicial Sixth Amendment error, Hughes was sentenced to a term of

imprisonment nearly four times as long as the maximum sentence authorized by the jury verdict. There can be no doubt that failure to notice such an error would seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* In reaching this conclusion, the panel found:

> [The record did] not provide any indication of what sentence the district court would have imposed had it exercised its discretion under § 3553(a), treating the guidelines as merely advisory. Thus, although it is certainly possible that Hughes will receive the same sentence on remand, there is nothing in the record to compel such a conclusion. This possibility is not enough to dissuade us from noticing the error.

*Id.* at 556 (citations and footnotes omitted).[1]

---

[1]While this passage in *Hughes* refers to the importance at the fourth step of the plain-error analysis of determining whether the trial judge indicated what the sentence would have been under an advisory scheme, *Hughes* and its progeny make clear that the two passages quoted above provide the governing analysis for addressing *Booker* Sixth Amendment error. Of course, "*Booker* Sixth Amendment error" is distinct from the "statutory *Booker* error" analyzed extensively in *United States v. White*, 405 F.3d 208 (4th Cir. 2005). A statutory *Booker* error arises when the trial judge errs by treating the guidelines as mandatory. *Id.* at 215-25. In *White* and *Hughes*, the Fourth Circuit made clear that a "statutory *Booker* error" was distinct from a *Booker* Sixth Amendment error, which arises when a trial judge increases a sentence based on facts not found by a jury (or in a guilty plea case, a fact not admitted to by the defendant). *See White*, 405 F.3d at 216 n.5; *Hughes*, 401 F.3d at 552. In *Hughes*, the court explained that "the act of mistakenly treating the guidelines as mandatory is not part of the Sixth Amendment error before us, despite the fact that the former mandatory nature of the guidelines set the stage for the constitutional violation in *Booker*." *Id.* at 553; *see also id.* at 551 n.8 ("This case does not present and we do not address, the question of whether a defendant suffers prejudice because a sentencing court fails to treat the guidelines as advisory in determining the sentence.") Thus, this court's analysis at the fourth step of its plain-error review in *White* to statutory *Booker* error does not suggest that this court applies the same plain-error analysis to a *Booker* Sixth Amendment violation.

Indeed, two aspects of *White* compel the opposite conclusion. First, the *White* majority explained that in *Hughes* the court exercised its discretion

The Fourth Circuit's approach in *Hughes* is consistent with the approach taken by the Third Circuit and the Sixth Circuit. *See United States v. Davis*, 407 F.3d 162, 164-65 (3d Cir. 2005) (en banc); *United States v. Oliver*, 397 F.3d 369, 380 (6th Cir. 2005). In contrast, the D.C., Second, Seventh, and Ninth Circuits have adopted a "limited remand" approach in order to help the appellate court assess the third step of plain-error review. *See United States v. Coles*, 403 F.3d 764, 765 (D.C. Cir. 2005) (per curiam); *United States v. Williams*, 399 F.3d 450, 459-60 (2d Cir. 2005); *United States v. Paladino*, 401 F.3d 471, 483-84 (7th Cir. 2005); *United States v. Ameline*, 409 F.3d 1073, 1084 (9th Cir. 2005) (en banc). Also in contrast, the First, Fifth, Eighth, Tenth, and Eleventh Circuits require a defendant raising a *Booker* Sixth Amendment violation for the first time on direct appeal to make a specific showing of prejudice to satisfy the third step of plain-error review. *See United States v. Antonakopoulos*, 399 F.3d 68, 75 (1st Cir. 2005); *United States v. Mares*, 402 F.3d 511, 521 (5th Cir. 2005); *United States v. Pirani*, 406 F.3d 543, 547 (8th Cir. 2005) (en banc); *United States v. Dazey*, 403 F.3d 1147, 1173-79 (10th Cir. 2005); *United States v. Rodriguez*, 398 F.3d 1291, 1302 (11th Cir. 2005); *cf. Hughes*, 401 F.3d at 549-52 (specifically rejecting the approach to the third step of the plain-error inquiry adopted by the Eleventh Circuit and declining to address the approach taken by the Second and Seventh Circuits).

---

to notice the *Booker* Sixth Amendment violation at the fourth step of the plain-error analysis due to the prejudicial effect arising from the substantial increase in Hughes' sentence. *White*, 405 F.3d at 224 n.11. Second, Judge Duncan's partial dissent in *White* aptly described *Hughes* as "decid[ing] that one segment of the total class of defendants authorized to seek resentencing can meet the stringent requirement of showing plain error and they are therefore entitled to resentencing." *Id.* at 226 (Duncan, J., concurring in part and dissenting in part). The segment of the total class of defendants to which Judge Duncan referred was "defendants whose maximum sentences as authorized by the jury were less than that imposed by the judge based on facts found pursuant to the mandatory sentencing regime . . . ." *Id.* at 226; *see also id.* at 227 ("*Hughes* concluded that one of the group of defendants sentenced under the now invalid § 3553(b)(1) *must be* resentenced . . . .") (emphasis added).

## II.

## A.

Since *Hughes*, every panel publishing a Fourth Circuit opinion applying *Hughes* to a *Booker* Sixth Amendment violation raised for the first time on direct appeal has exercised its discretion at the fourth step of the plain-error analysis to notice the error, vacate the sentence, and remand for resentencing. *See United States v. Uzenski*, 434 F.3d 690, 711-12 (4th Cir. 2006); *United States v. Cardwell*, 433 F.3d 378, 391-93 (4th Cir. 2005); *United States v. Ebersole*, 411 F.3d 517, 534-35 (4th Cir. 2005); *United States v. Gray*, 405 F.3d 227, 243-44 (4th Cir. 2005); *United States v. Ruhbayan*, 406 F.3d 292, 302 (4th Cir. 2005); *United States v. Washington*, 398 F.3d 306, 312-13 (4th Cir. 2005).[2] In all of these cases, the record did not reflect what sentence the district judge would have imposed absent the *Booker* Sixth Amendment violation.

In this case, Moore received a life sentence after a *Booker* Sixth Amendment violation. Absent the *Booker* violation, Moore would

---

[2]Although this footnote does not include a string cite to all Fourth Circuit unpublished opinions that have applied *Hughes* and its progeny, the same appears to be true with respect to unpublished opinions. For example, four recent unpublished opinions vacate and remand sentences with almost no discussion after finding *Booker* Sixth Amendment violations raised for the first time on direct appeal. *See United States v. Fields*, No. 03-4645, slip op. at 2-3 (4th Cir. Feb. 9, 2006) (unpublished); *United States v. Perez-Mendez*, No. 04-4151, slip. op. at 5-6 (4th Cir. Jan. 3, 2006) (unpublished); *United States v. Burwell*, No. 04-4200, slip. op. at 7-8 (4th Cir. Jan. 3, 2006) (unpublished); *United States v. McCullum*, No. 05-4078, slip. op. at 3 (4th Cir. Jan. 3, 2006) (unpublished). One Fourth Circuit panel, in an unpublished opinion, found that no Sixth Amendment violation took place, but then stated in dicta that even if it had found a Sixth Amendment violation it would have declined to remand based on *United States v. Cotton*, 535 U.S. 625 (2002). *See United States v. Shivers*, 146 F. App'x 609, 611 (4th Cir. Aug. 22, 2005) (unpublished). This dicta in *Shivers*, however, stands in contrast to the dozens upon dozens of cases that have vacated sentences after finding *Booker* Sixth Amendment violations and an absence of any indication of what the sentence would have been under an advisory scheme.

have faced a sentencing range of 292 to 365 months, based upon an offense level of 38 and a criminal history category of III. *See* Majority Opinion at 21. At Moore's sentencing, the district judge made certain findings of fact concerning drug quantities, Moore's leadership role, and his use of a minor, raising his offense level to 48. *See* Majority Opinion at 20-21; JA 2536-80 (entire transcript of sentencing hearing); JA 2554 (ultimate finding that the total offense level is 48 and criminal history category is III).

After determining the offense level to be 48 and the criminal history category to be III, the district judge stated that "the guideline range from the sentencing table is life." JA 2554. Before giving the defendant an opportunity to address the court, the court recognized the AUSA, who stated: "Obviously, the guideline range, if you want to call it a range in this case, is a mandatory life sentence, and we don't see any reason whatsoever to depart from that." JA 2565. The district judge then addressed Moore's counsel and stated: "Even though Mr. Moore gets a chance to argue, you also get a chance to argue. I don't know how much good it will do him, due to the fact the Court is bound by the guidelines." JA 2565. In response, Moore's counsel stated:

> It's the guidelines. There's not much I can say in this case. The guidelines say life and therefore, it's life. I understand that. There's not much I can say. I can't point to much mitigation, extenuation or anything else at this stage of the game, even if I had it because the guidelines say life.

JA 2565. The district judge then responded: "Also, even if the Court believes that a lesser time was appropriate, the Court doesn't have any options." JA 2566. Moore's counsel responded, "That's the way I understand the law, Judge." JA 2566. The district judge then recognized Moore to make a statement. Moore made a sworn statement. JA 2566-75. Thereafter, the district judge imposed a life sentence. JA 2575-76, 2581-82.

## B.

At the fourth step of the plain-error analysis in this case, the majority declines to notice error, vacate the sentence, and remand for resen-

tencing because "evidence concerning drug quantity was overwhelming and uncontroverted." Majority Opinion at 22. The majority's statement concerning drug quantities is undeniably correct, particularly in light of the district judge's discussion concerning drug quantities at the sentencing hearing. *See* JA 2545-46. Nevertheless, the jury did not make these findings, or the other findings that raised Moore's offense level to 48, and Justice Stevens' opinion in *Booker* teaches that under a mandatory scheme "[a]ny fact . . . which is necessary to support a sentence exceeding the maximum authorized by the facts established by . . . a jury verdict must be . . . proved to a jury beyond a reasonable doubt." *United States v. Booker*, 125 S. Ct. 738, 756 (2005). Moreover, and critically, as in *Hughes* and its progeny, "[t]he record does not provide any indication of what sentence the district court would have imposed had it exercised its discretion under [section] 3553(a), treating the guidelines as merely advisory." *Hughes*, 401 F.3d at 556.

In declining to notice the error, vacate the sentence, and remand, the majority cites *Johnson v. United States*, 520 U.S. 461 (1997), *United States v. Promise*, 255 F.3d 150 (4th Cir, 2001) (en banc), and *United States v. Cotton*, 535 U.S. 625, 628-33 (2002). All three of these cases were decided pre-*Booker* and pre-*Hughes*. In *Johnson*, the Supreme Court found that the district court committed error by failing to submit the issue of materiality to the jury in a perjury prosecution, but nevertheless declined to notice the error and vacate the conviction under plain-error review. *Johnson*, 520 U.S. at 467-70. The Court found that the evidence supporting the materiality element was overwhelming and "essentially uncontroverted" at trial and on appeal. *Id.* at 470. In concluding that the error did not "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings," the Court stated: "Indeed, it would be the reversal of a *conviction* such as this which would have that effect." *Id.* (quotation omitted) (emphasis added).

In *Promise*, the Fourth Circuit held that a defendant's sentence was erroneous because the indictment charging him did not allege the specific threshold drug quantities necessary to expose the defendant to a higher maximum sentence under the governing statute and because no quantity determination was made by the jury. *Promise*, 255 F.3d at 152. Under plain-error review, the court declined to notice the error

and remand. It concluded, based on its review of the evidence presented at trial, that "[t]here simply can be no doubt that had the indictment included the specific threshold quantity of 50 grams of cocaine base, the jury would have found Promise guilty beyond a reasonable doubt." *Id.* at 164.

In *Cotton*, the Supreme Court upheld a defendant's sentence based upon the statutory drug-quantity sentencing enhancements in 21 U.S.C. § 841(b)(1)(A) even though such quantities were not alleged in the indictment. *Id.* The enhancement increased the maximum possible sentence from 20 years to life. *Id.* at 628. Two defendants received 30-year sentences and the others received life sentences. *Id.* Even assuming that the defendants established plain error arising from the omission of drug quantity in the indictment, the Court in *Cotton* declined to notice the error at the fourth step because the evidence at trial that the conspiracy involved at least 50 grams of cocaine base was "overwhelming" and "essentially uncontroverted." *Id.* at 632-33. The effect of the Court's application of plain-error doctrine in *Cotton* was to obviate the need for a new indictment and a new trial. *See id.* at 634.

In this case, unlike the defendants in *Cotton* or *Promise*, Moore can receive the exact same sentence on remand without having to be re-indicted and re-tried. Moore's superceding indictment charges drug quantities. *See* JA 154-85. Further, the jury answered special interrogatories about certain drug quantities. *See* JA 2411-20. Although these quantities were not the quantities listed in the indictment, they did correspond to the "specific threshold drug quantities" codified in 21 U.S.C. § 841(b). *See* Majority Opinion at 21-22. Likewise, unlike *Johnson*, there was no error implicating the validity of Moore's conviction, thereby requiring a new trial. Accordingly, *Cotton*, *Promise*, and *Johnson* do not control, and the rationale underlying *Cotton*, *Promise*, and *Johnson* does not apply. Rather, if the error in Moore's sentence is noticed and the case remanded, the district court can go back and make the same, now-permissible, findings of fact, treat the guidelines as advisory pursuant to *Booker* and *Hughes*, and resentence Moore. On remand, the district court's sentencing discretion would include, but not require, a life sentence.

Even though *Johnson*, *Promise*, and *Cotton* are distinguishable from the facts in this case, the more significant point is that *Hughes* and its progeny foreclose the majority's analysis at the fourth step of plain-error review for *Booker* Sixth Amendment errors. Essentially, *Hughes* and its progeny hold that all such *Booker* Sixth Amendment errors require a remand in those instances where it is unclear what sentence the district judge would have imposed had the guidelines been advisory. Here, the majority departs from this Fourth Circuit precedent by applying *Johnson*, *Promise*, and *Cotton*[3] to a Sixth Amendment *Booker* violation raised for the first time on direct appeal where the judge-found facts prejudiced the defendant and the record gives no indication of what sentence the district court would have imposed under an advisory scheme.[4] Indeed, until this opinion, it

---

[3]The Fourth Circuit did apply *Cotton* at the fourth step of plain-error analysis in *United States v. Harp*, 406 F.3d 242 (4th Cir. 2005). In *Harp*, however, the court confronted a situation in which the elements of a career offender designation were not alleged in the indictment. *Harp*, 406 F.3d at 247. Again, because there is no defect in Moore's indictment, *Harp*'s application of *Cotton* is not implicated in this case.

[4]A *Cotton*-type analysis of the evidence is not uncommon at the third or fourth step of plain-error review of the Sixth Amendment *Booker* violations raised for the first time on direct review in the First, Fifth, Eighth, Tenth, and Eleventh Circuits. *See*, *e.g.*, *Pirani*, 406 F.3d at 554; *Dazey*, 403 F.3d at 1177. By contrast, the Sixth Circuit has expressly rejected applying *Cotton* to *Booker* Sixth Amendment violations raised for the first time on direct appeal. *See Oliver*, 397 F.3d at 380 n.3. Likewise, the Third Circuit's unanimous en banc decision in *Davis* implicitly rejected applying *Cotton* to *Booker* Sixth Amendment violations raised for the first time on direct appeal. *See Davis*, 407 F.3d at 164-65.

In *Oliver*, the Sixth Circuit cogently explained why the type of plain-error analysis employed in *Cotton* is not necessarily applicable in the context of *Booker* Sixth Amendment violations. The court explained that the "outcome in *Cotton* was premised on the determination that an *Apprendi* violation could not be remedied through re-sentencing." *Oliver*, 397 F.3d at 380 n.3. The court further explained that the remedial opinion in *Booker* obviated this concern by granting district judges the discretion to make the same findings under the now advisory system. *Id.* Finally, it noted that an appellate court weighing whether evidence was "overwhelming and essentially uncontroverted," cannot answer the question of what sentence a district judge would have given with the same

appeared that the Fourth Circuit would rely on *Hughes* and its progeny to notice error and remand every sentence infected by such a *Booker* Sixth Amendment violation.

C.

The majority states that it is "unavailing" that no Fourth Circuit panel has paused at the fourth step of the plain-error analysis to consider whether the evidence was "overwhelming" and "essentially uncontroverted." Majority Opinion at 23 n.10. The majority then states that it "cannot take silence as an indication that [all of the Fourth Circuit panels applying *Hughes* and its progeny to *Booker* Sixth Amendment violations raised for the first time on direct appeal] decided such an inquiry was improper. Even if that is one possible inference, it is equally plausible that the issue was not presented or that the evidence was not overwhelming or uncontroverted." *Id.*

The majority's observation about the silence of all Fourth Circuit panels calls to mind the Sherlock Holmes mystery Silver Blaze. Arthur Conan Doyle, Silver Blaze, in The Complete Sherlock Holmes 335 (1927). In Silver Blaze, Sherlock Holmes was investigating the theft of an expensive race horse named Silver Blaze from a stable and the death of Silver Blaze's trainer. Another investigator asked Holmes if there was any particular aspect of the crime that was worthy of attention. *Id.* at 347. Holmes replied in the affirmative, noting "the curious incident of the dog in the night-time." *Id.* The investigator said to Holmes, "The dog did nothing in the night-time." *Id.* Holmes responded, "That was the curious incident." *Id.* Holmes then pointed out that the failure of the watch dog to bark when Silver Blaze was stolen showed that the watch dog knew the thief. *Id.* at 349. This fact was compelling, considerably reduced the number of suspects, and eventually solved the case. *Id.*

---

evidence under an advisory scheme and, as such, *Cotton*-type analysis at the appellate level "usurp[s] the discretionary power granted to the district courts by *Booker*" by assuming that the same sentence would have been imposed. *Id.* Citing *Oliver,* the en banc Third Circuit unanimously came to the same conclusion in *Davis*. *See Davis*, 407 F.3d at 165.

As in Silver Blaze, the failure of any Fourth Circuit panel applying *Hughes* and its progeny to "bark" at the fourth step of the plain-error analysis is compelling. This deafening silence confirms Judge Duncan's observation in *White* that *Hughes* and its progeny applied to "a total class of defendants." *White*, 405 F.3d at 226 (Duncan J., concurring in part and dissenting in part).

If the Fourth Circuit's silence in its post-*Hughes* progeny (both published and unpublished) were not enough, a close review of four published cases — *Uzenski*, *Cardwell*, *Ebersole*, and *Ruhbayan* — demonstrates how *Hughes* has been interpreted to preclude the majority's analysis. In all of these cases, the panels cited *Hughes*, noted that the record did not reflect what sentence the district judge would have imposed absent the *Booker* Sixth Amendment violation, and remanded, regardless of whether the evidence relating to judge-found facts was "overwhelming" and "essentially uncontroverted."

In *Uzenski*, 434 F.3d at 694, the defendant was convicted of four counts related to manufacturing and possessing an unregistered firearm (to wit, pipe bombs) and a fifth count of obstruction of justice. At sentencing, the district judge found "abuse of position of trust or use of special skill" under section 3B1.3 of the United States Sentencing Guidelines and thereby increased the defendant's sentence from a range of 41-53 months to an actual sentence of 60 months. *Id.* at 711. The panel described the defendant as a detective for the Winterville Police Department who had experience with explosives. *Id.* at 694-95. The defendant built two pipe bombs. He planted one of them on the main highway leading into the town of Winterville, North Carolina. He then "discovered" the pipe bomb while on patrol, used his police radio to call for help, and was designated the case agent. A variety of law enforcement personnel responded to the scene and disarmed the bomb. Law enforcement personnel then searched the area thoroughly and turned evidence over to the defendant in his capacity as case agent. That evening, the defendant returned to the scene and planted another pipe bomb three feet from the site of where he "found" the first pipe bomb. The next day, along with other law enforcement personnel, the defendant returned to the location to investigate the "first" pipe bomb and law enforcement personnel discovered the second pipe bomb. Again, the highway was closed, and the second pipe bomb was disarmed. *Id.* at 694-95. After the investi-

gation focused on the defendant, the defendant repeatedly denied any involvement with building the pipe bombs or planting them on the highway. *Id.* at 697-98.

Under the majority's analysis, the fourth step of plain-error analysis now requires each panel to ask whether there is any "question that the jury, having found that the offenses were committed, would have also determined that the offenses involved [the judge-found fact that increased the sentencing range.]" Majority Opinion at 23. In my view, if the jury in *Uzenski* were asked whether Detective Uzenski "abused a position of public trust . . . in a manner that significantly facilitated the commission or concealment of the offense," then the jury would have answered that question yes. That, however, is not what the *Uzenski* panel did. Instead, the panel noticed the error at the fourth step, and remanded the case to the district judge who found the fact concerning abuse of a position of public trust and imposed the sentence.

Similarly, in *Cardwell*, the two defendants each received a judge-found four-level enhancement on their "murder-for-hire convictions based on [the district court's] finding that the conspiracy and solicitation offenses involved the offer or the receipt of anything of pecuniary value for undertaking the murder." *Cardwell*, 433 F.3d at 392 (quotation omitted). Without the judge-found fact, defendant Hinson's sentencing range would have been 210-262 months. With this judge-found fact, his range increased and the court sentenced Hinson to 293 months. *Id.* As to defendant Cardwell, without this judge-found fact, Cardwell's sentencing range would have been 78-97 months. With the judge-found fact, Cardwell's range increased and the court sentenced Cardwell to 131 months. *Id.* The panel analyzed the fourth part of the plain-error analysis for the defendants' sentences, noticed the errors, and remanded for resentencing. *Id.* at 392-93.

The *Cardwell* panel noted that the government initially argued that any error should not be noticed because the evidence concerning the enhancements was "overwhelming" and "essentially uncontroverted," but "expressly abandoned this position at oral argument and in supplemental briefing." *Id.* at 392 n.7. As the government's supplemental filing in that case suggests, the government abandoned this argument not based on the weight of the evidence relating to the judge-found

facts, but rather because the United States Department of Justice believes that *Hughes* mandates that a sentence be vacated and remanded if infected with *Booker* Sixth Amendment error and there is no indication of what sentence the district judge would have imposed and under an advisory system. *See* Gov. Supp. Citation of Authority 1 ("In *United States v. Hughes* . . . the Court ruled that a mandatory guidelines sentence that was enhanced by judicial fact-finding in violation of *United States v. Booker* . . . *requires* vacation of the sentence and a remand for resentencing.") (emphasis added).

In *Ebersole*, the defendant was convicted of 25 counts of wire fraud and two counts of presenting false claims to the government. *Ebersole*, 411 F.3d at 520. "Without the various enhancements to the offense level — each of which was based upon facts found by the district court, not by the jury — the applicable sentencing range would have been zero to six months of imprisonment." *Id.* at 534.

As for the fourth prong of the plain-error analysis, the *Ebersole* panel applied *Hughes* and its progeny and stated:

> Finally, to affirm Ebersole's sentence despite the error would seriously affect the fairness, integrity, or public reputation of the judicial proceedings. In the wake of *Booker*, as we have recognized, the Guidelines are to be treated as advisory, rather than mandatory, and sentences that fall within the statutorily prescribed range are reviewable only for reasonableness. *Hughes*, 401 F.3d at 546 (citing *Booker*, 125 S.Ct. at 765-68). The record before us does not indicate what sentence the court would have imposed on Ebersole had its exercised its discretion under 18 U.S.C. § 3553(a) and treated the Guidelines as merely advisory; although it is possible that Ebersole will receive the same sentence on remand, "[t]his possibility is not enough to dissuade us from noticing the error." *Id.* at 556. We therefore exercise our discretion to notice the error, vacate Ebersole's sentence, and remand for resentencing consistent with *Booker* and its progeny.

*Id.* at 535.

Finally, in *Ruhbayan*, the panel analyzed a *Booker* Sixth Amendment error and a record devoid of what sentence the district judge would have imposed absent the error. *Ruhbayan*, 406 F.3d at 302. The panel stated that, under such circumstances, it was "obliged to exercise" its discretion to notice the error, vacate the sentence, and remand for resentencing. *Id.* The sentencing variance based on the *Booker* Sixth Amendment error in *Ruhbayan* is similar to the variance faced by Moore. In *Ruhbayan*, the *Booker* Sixth Amendment violation led the district court to impose a life sentence — "a total term of imprisonment greater than that authorized by the jury verdict, seriously affecting 'the fairness, integrity or public reputation of the judicial proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 732).[5] Absent the judge-found facts in *Ruhbayan*, the defendant's maximum sentence under the guidelines would have been 262 months. *See id.* at 301 n.9.

### III.

Given that the district judge, Moore's counsel, and the AUSA all agreed that life was mandatory in light of the findings and, critically, that the district judge never indicated that he believed life in prison was appropriate for Moore even under a non-mandatory system, this case is materially indistinguishable from *Hughes* and its progeny. In fact, in reviewing *Hughes* and its progeny (both published and unpublished), it appears that countless Fourth Circuit panels could have paused at the fourth step of the plain-error analysis, cited *Johnson*, *Promise*, or *Cotton*, asked what the jury would have determined as to the judge-found fact, and held that the evidence associated with a given judge-found fact was "overwhelming" and "essentially uncontroverted."[6] The panels did not, however, apparently due to the Sixth

---

[5]The district judge departed upward from the guidelines in imposing a life sentence, but the Fourth Circuit concluded that this upward departure was premised on the district judge's factual finding relating to the defendant's role in the offense. *Ruhbayan*, 406 F.3d at 302.

[6]This newly announced method of asking panels of this court at the fourth step of plain-error analysis to step in the shoes of a jury and predict what the jury would have found as to a given fact resulting in an enhancement and then predict the effect of the enhancement on the sentence raises other issues. For example, the vast majority of criminal cases are resolved through guilty pleas. Before today, in cases involving guilty

Amendment principles articulated in *Booker*, the fourth step of the plain-error analysis applied in *Hughes* and its progeny, and principles of stare decisis. *Cf. United States v. Prince-Oyibo*, 320 F.3d 494, 498 (4th Cir. 2003) (panels of this court cannot overrule, explicitly or

---

pleas, *Booker* Sixth Amendment error, and a record devoid of what sentence the district judge would have imposed, this court held that "a sentence that was imposed under the pre-*Booker* mandatory sentencing scheme and was enhanced based on facts found by the court . . . [and] not admitted to by the defendant [ ] constitutes plain error that affects the defendant's substantial rights and warrants reversal under *Booker* when the record does not disclose what discretionary sentence the district court would have imposed under an advisory guidelines scheme." *United States v. Spivey*, No. 04-4657, slip op. at 3 (4th Cir. Mar. 8, 2006) (unpublished)(citing *Hughes*, 401 F.3d 546-56).

Apparently, a different process will now take place at the fourth step of plain-error analysis involving guilty pleas, *Booker* Sixth Amendment error, and a record devoid of what sentence the district judge would have imposed. Specifically, panels of this court will pause at the fourth step of plain-error analysis, review the record of the arraignment and sentencing hearings (and any other record evidence from the district court), stand in the shoes of the district judge who actually found the facts that created the *Booker* Sixth Amendment error and imposed the sentence, determine whether the evidence as to a given judge-found fact was "overwhelming" and "essentially uncontroverted" (though not admitted by the defendant), and then speculate as to what the district judge would have done. If the appellate panel determines that the record evidence in front of the district judge was "overwhelming" and "essentially uncontroverted" as to a given judge-found fact, then the case will not be remanded to that district judge to resentence the defendant.

In my view, whether a case is resolved by a jury verdict or a guilty plea, *Hughes* and its progeny dictate a more straightforward approach at the fourth step of this court's plain-error analysis: if the record is devoid of what sentence the district judge would have imposed, the panel remands the case to the district judge who found the facts that created the *Booker* Sixth Amendment error and imposed the sentence and directs the district judge to resentence the defendant under the advisory system. Moreover, in stating that a district judge "created" a *Booker* Sixth Amendment error, I offer no criticism of any district judge. Such judges were simply following "the law and procedure in effect at the time" of sentencing. *Hughes*, 401 F.3d at 545 n.4.

implicitly, the precedent set by a prior panel; only the Supreme Court or this court sitting en banc can do that); *United States v. Chong*, 285 F.3d 343, 346 (4th Cir. 2002) (same); *accord McMellon v. United States*, 387 F.3d 329, 332-33 (4th Cir. 2005) (en banc).

### IV.

If the Fourth Circuit wants to revisit *Hughes* and its progeny sitting en banc and address the merits of the majority's approach to plain-error analysis, the entire court is (of course) free to do so. I offer no opinion as to whether *Hughes* and its progeny are in tension with the third or fourth step of plain-error analysis in cases such as *Olano*, *Johnson*, and *Cotton*. My point is much more narrow: unless this court revisits *Hughes* and its progeny en banc, and an en banc court adopts the majority's approach, *Hughes* and its progeny control. Accordingly, the failure to notice the *Booker* Sixth Amendment violation applicable to Moore, vacate his sentence, and remand for resentencing would "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." *Gray*, 405 F.3d at 243; *Ruhbayan*, 406 F.3d at 302. Further, given that Moore is age 43 (JA 2581), the difference between a life sentence and a 365-month sentence is material. *See, e.g., Gray*, 405 F.3d at 243; *Ruhbayan*, 406 F.3d at 301-02. Thus, I respectfully dissent from the failure to notice the *Booker* Sixth Amendment violation applicable to Moore's sentence, to vacate Moore's sentence, and to remand for resentencing. In all other respects, I concur in the majority opinion.